IOWA CITY COMMUNITY SCHOOL
DISTRICT, Appellant,

v.

IOWA CITY EDUCATION
ASSOCIATION, Appellee.

No. 68574.

Supreme Court of Iowa.

Dec. 21, 1983.

Rehearing Denied Jan. 19, 1984.

John R. Phillips and Russell L. Samson of Rogers, Phillips & Swanger, Des Moines, for appellant.

Charles E. Gribble and Gerald L. Hammond of Sayre & Gribble, Des Moines, for appellee.

Edgar H. Bittle and Elizabeth Gregg Kennedy of Ahlers, Cooney, Dorweiler, Haynie & Smith, Des Moines, for amicus curiae Iowa Ass'n of School Boards, Inc.

**McCORMICK, Justice.**

We granted further review of a court of appeals decision reversing a district court judgment upholding the award of an arbitrator in a teacher grievance proceeding. Plaintiff Iowa City Community School District and defendant Iowa City Education Association provided in their collective bargaining agreement for final and binding arbitration of teacher grievances. Applying the standard of judicial review adopted in *Sergeant Bluff-Luton Education Association v. Sergeant Bluff-Luton Community School District*, 282 N.W.2d 144, 147–48 (Iowa 1979), we find that the issue was arbitrable and that the arbitrator's decision drew its essence from the parties' contract. In addition, we reject the district's contention that enforcement of the award should be denied on public policy grounds. Therefore we vacate the decision of the court of appeals and affirm the district court.

The collective bargaining agreement for the 1979–80 school year contained grievance procedures culminating in arbitration for complaints "of an alleged violation, misinterpretation, or misapplication of . . . specific provisions" of the contract. A teacher salary schedule was among the specific contract provisions. The schedule was based on years of teaching and educational achievement. Teachers were entitled to step increases upon completion of each additional year of service, "subject to the right of the district to withhold salary increases for unsatisfactory performance." An across-the-board salary increase was superimposed on the schedule in the 1980–81 contact, which otherwise contained the same relevant terms.

The present problem arose in March 1980 when the district notified Richard D. Bristol, a social studies teacher, that his 1980–81 salary would be frozen at the 1979–80 level of $19,205 because of "unsatisfactory service." The effect of the district action was to deny Bristol the benefit of the across-the-board increase that would have raised his salary to $21,236.

The association pursued grievance procedures in Bristol's behalf, resulting in a favorable arbitration decision. Besides sustaining the grievance, the arbitrator ordered the district to make retroactive payment of the salary increase. The district filed a district court petition asking that the arbitrator's order be vacated and its

enforcement enjoined. The association resisted and requested enforcement. After hearing, the district court rejected the district's attack and ordered enforcement of the award. Upon appeal, the court of appeals reversed, and we granted further review.

The questions are whether the issue of unsatisfactory performance was arbitrable, whether the award drew its essence from the collective bargaining agreement, and whether enforcement should be denied on public policy grounds.

I. *Arbitrability.* In *Sergeant Bluff-Luton* this court said: "The threshold question in reviewing an arbitrator's award is to determine whether the issue in dispute is one which the parties had agreed to settle by arbitration." 282 N.W.2d at 147. The district does not challenge the arbitrability of teacher grievances under the contract. It does contend, however, that the contract does not give an arbitrator the authority to say what constitutes "unsatisfactory performance." The district asserts that the issue is reserved to management and is thus not arbitrable.

■ Arbitrability is a legal issue that is to be determined by interpretation and construction of the parties' contract. *Hawkins/Korshoj v. State Board of Regents,* 255 N.W.2d 124, 127 (Iowa 1977). Because arbitration is favored as a means of settling civil disputes without the expense and delay of litigation, arbitrability will be recognized "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Sergeant Bluff-Luton,* 282 N.W.2d at 147–48, quoting *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409, 1417–18 (1960).

■ In the present case, the district contends it had the exclusive right to determine what constitutes "unsatisfactory performance." The district argues this result is dictated by this court's decisions giving a narrow interpretation to the list of mandatory bargaining topics in Iowa Code section 20.9 (1983). *See, e.g., Charles City Community School District v. PERB,* 275 N.W.2d 766, 773 (Iowa 1979). This argument overlooks the concomitant favorable legislative view of arbitration as a means of resolving grievances noted by this court in *Sergeant Bluff-Luton. See* 282 N.W.2d at 147. Moreover, the restrictive interpretation of mandatory bargaining topics does not inhibit voluntary bargaining and agreement on permissive topics.

The district's reliance on the statutory delineation of employer rights in Code section 20.7 is similarly misplaced. This court recognized the right of parties to agree on submission of teacher termination issues to arbitration in *Shenandoah Education Association v. Shenandoah Community School District,* 337 N.W.2d 477, 480–81 (Iowa 1983). No difference in principle exists in the present situation.

■ Finally, nothing in the contract provides a positive assurance that the dispute is not arbitrable. The district's right to withhold a salary increase depends on the teacher's "unsatisfactory performance." The contract does not define the term. Arbitrable grievances include any complaint of "alleged ... misinterpretation, or misapplication of ... specific provisions" of the agreement. Bristol's grievance was based on a complaint that the district misinterpreted and misapplied the salary freeze provision. The contract contains no express limitation on arbitrability of the issue. This is so despite an express contractual provision limiting arbitrability of other issues including just cause for termination. The absence of an express exclusion supports finding exclusion was not intended. *See Carey v. General Electric Co.,* 315 F.2d 499, 506 (2d Cir.1963), *cert. denied,* 377 U.S. 908, 84 S.Ct. 1162, 12 L.Ed.2d 179 (1964).

The district alleges an express prohibition is manifested in a contract provision that the arbitrator "shall not amend, modify, nullify, ignore, or add to the provisions of the Agreement." This provision mirrors

the statutory provision in Code section 20.-18. The statutory provision also states: "Negotiated procedures may provide for binding arbitration of public employee grievances and of disputes over the interpretation and application of existing agreements." We have consistently recognized the distinction between ascertaining the proper legal meaning of an agreement and changing its legal meaning. *See generally Hamilton v. Wosepka*, 261 Iowa 299, 154 N.W.2d 164 (1967). The present grievance required the arbitrator to interpret and apply the agreement, but it did not require a change or addition to it. Arbitrability is not precluded in these circumstances. *See West Jefferson Hills School District v. Jefferson Federation of Teachers*, 61 Pa. Commw. 374, 378, 433 A.2d 643, 645 (1981); *Civil Service Employees Association v. Lombard*, 50 A.D.2d 708, 709, 374 N.Y.S.2d 894, 896–97 (1975).

We hold that the collective bargaining agreement made the issue of unsatisfactory teacher performance arbitrable. This includes authority of the arbitrator, pursuant to Code section 20.18, to interpret and apply the relevant contract provision.

II. *Authority for the award.* In *Sergeant Bluff-Luton,* this court said: "Once arbitrability of [an] issue is established, the sole question ... is whether the arbitrator's award 'drew its essence' from the collective bargaining agreement." 282 N.W.2d at 148. The district seeks to upset the arbitrator's award on the ground it did not "draw its essence" from the agreement.

We relied on relevant federal authority in adopting a narrow scope of judicial review of arbitration decisions in *Sergeant Bluff-Luton:* "It is not the function of the court to determine whether the arbitrator has resolved the grievance correctly." 282 N.W.2d at 148. This court also said:

The "essence" of a collective bargaining agreement is an extremely broad concept. It requires a casting aside of traditional views of contract law in favor of a multitude of other considerations, including not only the written and unwritten agreements, themselves, but also the practices of the parties or the industry in general.

*Id.* at 150. The court quoted with approval the following from *Warrior & Gulf Navigation Co.,* 363 U.S. at 581–82, 80 S.Ct. at 1352, 4 L.Ed.2d at 1417:

The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment.

282 N.W.2d at 150. This court added:

The essence of the agreement even draws upon other vaguely defined concepts of the particular industry having their roots in considerations of fairness, reasonableness and practicality.

*Id.* As a consequence the court held in *Sergeant Bluff-Luton* that an arbitrator did not depart from his authority in resolving a salary schedule grievance by asserting an inability to interpret the parties' contract and relying on implied management rights and responsibilities as shown by the practices of the district in applying the salary schedule to other teachers. *Id.*

The role of an arbitrator has been authoritatively described as follows:

Put most simply, the arbitrator is the parties' officially designated "reader" of the contract. He (or she) is their joint *alter ego* for the purpose of striking whatever supplementary bargain is necessary to handle the anticipated unanticipated omissions of the initial agreement. Thus, a "misinterpretation" or "gross mistake" by the arbitrator becomes a contradiction in terms. In the absence of fraud or an overreaching of authority on the part of the arbitrator, he is speaking for the parties, and his award *is* their contract. That is what the "final and

binding" language of the arbitration clause says. In sum, the arbitrator's award should be treated as though it were a written stipulation by the parties setting forth their own definitive construction of the labor contract. (emphasis in original).

St. Antoine, *Judicial Review of Labor Arbitration Awards: A Second Look at Enterprise Wheel and Its Progeny*, 75 Mich. L.Rev. 1137, 1140 (1977).

▆▆▆ Unless the parties limit their submission, the arbitrator becomes the final judge of the facts and law:

In agreeing to resolve disputes by arbitration, parties choose to substitute a private solution for litigation in courts of law. Since the appointment and authority of the arbitrator are under the control of the parties, they can by the submission agreement expressly regulate (but do not often do so) the extent to which he is to consider applicable law. Thus, for instance, they may expressly direct him to decide the case consistent with applicable law, or they may restrict his authority to interpret the law....

Unless the parties specifically limit the powers of the arbitrator in deciding various aspects of the issue submitted to him, it is often presumed that they intend to make him the final judge on any questions which arise in the disposition of the issue, including not only questions of fact but also questions of contract interpretation, rules of interpretation, and questions, if any, with respect to substantive law.

F. Elkouri & E. Elkouri, *How Arbitration Works* 321 (3d ed. 1973). Mistakes of either fact or law are among the contingencies the parties assume when they submit a dispute to arbitration. 5 Am.Jur.2d *Arbitration and Award* § 167, at 644 (1962). The United States Supreme Court has summarized the role of courts in reviewing arbitration awards:

Arbitrators are judges chosen by the parties to decide the matters submitted to them, finally and without appeal. As a mode of settling disputes, it should

receive every encouragement from courts of equity. If the award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court of equity will not set it aside for error, either in law or fact. A contrary course would be a substitution of the judgment of the chancellor in place of the judges chosen by the parties, and would make an award the commencement, not the end, of litigation.

*Burchell v. Marsh*, 58 U.S. (17 How.) 344, 349, 15 L.Ed. 96, 99 (1855). The collective bargain agreement made the arbitrator's award "final and binding" in this case. The agreement did not limit his authority to weigh the evidence or decide the law.

Despite the breadth of the arbitrator's authority, the district contends he was not faithful to the submission. It asserts he ignored his obligation and dispensed "his own brand of industrial justice." The district relies on the limitation stated by the Supreme Court in *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424, 1428 (1960):

Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*See Sergeant Bluff-Luton*, 282 N.W.2d at 149.

The district then proceeds to dissect the arbitrator's opinion in an effort to show he violated this precept. In doing so the district reads the arbitrator's decision as if the arbitrator found Bristol's performance unsatisfactory within the meaning of the agreement but nevertheless held in his favor. We disagree with the district's reading of the decision. The arbitrator did not

find that Bristol's performance was unsatisfactory. Rather, the arbitrator merely noted that if the district were correct in its contention that the district had exclusive authority to decide what constitutes unsatisfactory performance he could not say the district's actions were "arbitrary and unjustified" and "this matter ends there." The arbitrator rejected this limitation on his substantive authority, and his position is consistent with our holding in division I of this opinion.

█ The district also quarrels with the meaning given the concept of unsatisfactory performance by the arbitrator. It accuses the arbitrator of saying a finding of unsatisfactory performance had to be based on averaging Bristol's performance over his entire tenure rather than on evaluations in the period immediately preceding the decision to freeze his salary. Assuming, without deciding, this was the arbitrator's interpretation, the agreement gave the arbitrator the task of defining the concept. That the arbitrator made a mistake, even a mistake of law, in arriving at his interpretation is not a basis for upsetting his decision. The district's disagreement with the arbitrator's view of the facts is similarly unavailing. We note that no record was kept of the testimony before the arbitrator. The record relied on by the district consists entirely of its documentary exhibits. Even if the district were relying on the whole record, however, it has misconceived the scope of judicial review.

█ Courts do not presume that an arbitrator has exceeded his authority merely because they disagree with the arbitrator's reasoning:

An arbitrator's award does "draw its essence from the collective bargaining agreement" so long as the interpretation can in some rational manner be derived from the agreement, "viewed in the light of its language, its context, and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principle of contract construction and the law of the shop, may a reviewing court

disturb the award." [citations omitted]. Neither the correctness of the arbitrator's conclusion nor the propriety of his reasoning is relevant to a reviewing court, so long as his award complies with the aforementioned standards to be applied by the reviewing court in exercising its limited function. [citation omitted].

*Amoco Oil Co. v. Oil, Chemical & Atomic Workers International Union, Local 7–1*, 548 F.2d 1288, 1294 (7th Cir.), *cert. denied*, 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977).

Under this standard we cannot say the arbitrator ignored the agreement and dispensed "his own brand of industrial justice." The present situation is not one where an arbitrator has recognized his award is contrary to express terms in a collective bargaining agreement but nevertheless disregards or modifies those terms in making his award. *See, e.g., Sears, Roebuck and Co. v. Teamsters Local Union No. 243*, 683 F.2d 154, 155–56 (6th Cir. 1982), *cert. denied*, — U.S. ——, 103 S.Ct. 1274, 75 L.Ed.2d 495 (1983); *Mistletoe Express Service v. Motor Expressmen's Union*, 566 F.2d 692, 695 (10th Cir.1977); *Litvak Packing Co. v. Amalgamated Butcher Workmen, Local No. 641*, 455 F.Supp. 1180, 1182 (D.Colo.1978); *Caribou Board of Education v. Caribou Teachers Association*, 404 A.2d 212, 215 (Me.1979); *Simpson v. North Collins Central School District*, 56 A.D.2d 166, 171–72, 392 N.Y.S.2d 107, 110 (1977), *aff'd*, 43 N.Y.2d 976, 375 N.E.2d 776, 404 N.Y.S.2d 596 (1978); *County of Allegheny v. Allegheny County Prison Employees Independent Union*, 476 Pa. 27, 38–39, 381 A.2d 849, 855 (1977). The comment of this court in an earlier case is equally applicable here:

As is typical in an action arising from an arbitration decision, the complaining party urges the arbitrator exceeded his authority and altered terms of the employment contract. However, we believe it is clear the arbitrator merely interpreted the contract in a way the school district would not and in a manner we might

not. But this does not render the arbitrator's interpretation an alteration.

*West Des Moines Community School District v. West Des Moines Educational Support Personnel,* 265 N.W.2d 625, 626 (Iowa 1978).

The arbitrator obviously did not believe Bristol's performance was unsatisfactory within the meaning of the agreement. This was the conclusion of the district court, and it is supported by the conclusions of the arbitrator:

> The Grievant's deficiencies, even taking at its flood the contentions advanced by the District, plainly are matters of degree and not of substance. The District is to be commended for its striving to have top teaching performance according to the lights of its supervisors and administrators at the time. However, the principles of teacher tenure would be illusory indeed if these were based solely upon whims, preferences and prejudices of the moment without regard to the long-term standards of performance, especially in connection with a teacher whose attitudes and sincere endeavor are not put in question.

We may disagree with the arbitrator. We may believe adequate past performance or long tenure should not prevent freezing the salary of a teacher whose evaluations are poor for three consecutive years. The issue, however, is not for the court to decide. It inheres in the dispute concerning unsatisfactory performance that was submitted to final and binding arbitration.

The arbitrator's decision in this case was well within the principles applied in upholding arbitration awards in analogous situations. *See, e.g., Mooge v. District 8, International Association of Machinists,* 454 F.2d 510, 513 (7th Cir.1971); *United Food & Commercial Workers International, Local Union No. 634, v. Gold Star Sausage Co.,* 487 F.Supp. 596, 598 (D.Colo. 1980), *aff'd,* 109 L.R.R.M. (BNA) 2779 (10th Cir. July 13, 1981). *Board of Education of Norwood-Norfolk Central School District v. Hess,* 49 N.Y.2d 145, 151–52, 400 N.E.2d 329, 331–32, 424 N.Y.S.2d 389, 391 (1979).

The decision cannot be upset without disregarding our limited scope of review. It would be necessary to rely on ambiguity in the arbitrator's decision to infer that he exceeded his authority. But the presumption runs the other way, and we are obliged when in doubt to presume the arbitrator did his duty. The parties entrusted the task of interpretation and application of the unsatisfactory performance standard to the arbitrator, and it cannot fairly be said his decision was not rationally derived from the collective bargaining agreement.

III. *Public policy.* The district asserts that permitting an arbitrator to decide what constitutes unsatisfactory teacher performance is contrary to Iowa public policy. The state's public policy is manifested in its statutes. *See Miner v. Lovilia Independent School District,* 212 Iowa 973, 977, 234 N.W. 817, 819 (1931). This court found no public policy impediment to arbitration of teacher termination decisions in *Shenandoah Education Association. See* 337 N.W.2d at 480–81. We find no public policy reason to reach a contrary conclusion here.

In *Sergeant Bluff-Luton,* the court said the General Assembly's favorable view of arbitration is evident in the Public Employment Relations Act. *See* 282 N.W.2d at 147. Section 20.18 authorizes parties to agree on binding arbitration of disputes concerning the interpretation and application of collective bargaining agreements. No exception was made for issues of teacher performance.

We hold that the district court was correct. We vacate the court of appeals decision and affirm the district court.

DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT AFFIRMED.

All Justices concur except REYNOLDSON, C.J., and UHLENHOPP, McGIVERIN and SCHULTZ, JJ., who dissent.

REYNOLDSON, Chief Justice (dissenting).

The "floodgates" spectre may subconsciously dictate the decision of an overworked court. Nonetheless, I respectfully dissent from the holding in each of the three divisions in the majority opinion.

I. The majority's conclusion this issue was arbitrable ignores Iowa statutory law and ultimately is grounded, as is its affirmance of the arbitrator's ruling, on an indiscriminate reliance on federal decisions that are of little applicability in view of the restrictive and unique provisions of Iowa's Public Employment Relations Act.

Private sector employers are profit oriented and ordinarily are responsible only to their stockholders. Their employee relationships evolve in the context of balance of power in the private labor marketplace. Federal labor laws, including the Labor-Management Relations Act of 1947, were adopted to equalize the power of competing labor—management forces, with the role of the federal government as that of a counterweight to the overconcentration of power on one side. 29 U.S.C.A. §§ 1 to 157, *Explanation* at V (West 1973).

Public employers are not profit oriented but grapple with the duty to deliver vital public services. They are responsible to the voters and to the people, who under our constitution, retain all political power. *See* Iowa Const. art. I, § 2:

All political power is inherent in the people. Government is instituted for the protection, security, and benefit of the people, and they have the right, at all times, to alter or reform the same, whenever the public good may require it.

The federal decisions, of course, do not address this fundamental distinction, but this court recognized it when it approvingly quoted the following passage from *Unified School District No. 1 v. Wisconsin Employment Relations Commission*, 81 Wis.2d 89, 98–99, 259 N.W.2d 724, 730 (1977):

There are important economic and policy reasons why the legislature would distinguish between collective bargaining in the public sector and the private sector:

" '... In the private sector, union demands are usually checked by the forces of competition and other market pressures. Negotiators are typically limited by such restraints as the entry of nonunion competitors, the impact of foreign goods, the substitution of capital for higher-priced labor, the shift of operations to lower-cost areas, the contracting out of high-cost operations to other enterprises, the shutdown of unprofitable plants and operations, the redesign of products to meet higher costs, and finally the managerial option to go out of business entirely. Similar limitations are either nonexistent or very much weaker in the public sector. While budgets and corresponding tax levies operate in a general way to check increases in compensation, the connection is remote and scarcely applicable to particular units of groups of strategically located public employees. ...' Cox and Bok, *Labor Law* (7th ed.), pages 970, 971." quoted in *Hortonville Ed. Asso. v. Joint Sch. Dist. No. 1*, 66 Wis.2d 469, 485, 225 N.W.2d 658, 666 (1975), *rev'd on other grounds*, 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976).

Moreover, governmental employers perform a substantially different role than do private employers, and there are different reasons for according them certain prerogatives. In the private sector, collective bargaining is limited by the need to protect the "core of entrepreneurial control," particularly power over the deployment of capital. If resources are to be employed efficiently in a market economy, capital must be mobile and responsive to market forces. ...

... In the public sector, the principal limit on the scope of collective bargaining is concern for the integrity of political processes.

*Charles City Community School District v. Public Employment Relations Board*, 275 N.W.2d 766, 770–71 (Iowa 1979).

The distinction the majority ignores has had the attention of commentators who find the "judicial hands-off" doctrine of the federal decisions inadequate to meet public sector requirements:

> In the public sector, however, labor relations problems and their solutions do not easily fit into the private sector mold. This is partly because each state is master of its own public sector labor relations policy and national uniformity is impossible. In addition, questions of public policy in the public sector are much broader than the private.

Toole, *Judicial Activism in Public Sector Grievance Arbitration: A Study of Recent Developments*, 33 Arb.J., Sept. 1978 at 6.

In the Public Employment Relations Act, Iowa's citizens exercised their constitutionally retained political power through their legislature and made sure they retained that power, together with the right to alter it "at all times." Iowa Const. art. I, § 2. In Iowa Code section 20.7 ("Public employer rights"), they plainly confined certain duties to the hands of those public employers they could hold responsible, directly or indirectly, at the polls. Thus section 20.7 relevantly provides:

> Public employers shall have ... the *exclusive ... duty ...* to:
>
> . . . .
>
> 3. Suspend or discharge public employees for proper cause.

(Emphasis added.) The word "exclusive" is derived from "ex" (out) and "claudere" (to shut), and precludes the concept of coexistence. In its ordinary sense it means possessed to the exclusion of others; debarred from participation or enjoyment; not including, admitting, or pertaining to any other. *City of Nevada v. Bastow*, 328 S.W.2d 45, 47 (Mo.App.1959); 33 C.J.S. *Exclusive* at 112 (1942). In its race to adopt federal case law to control Iowa public sector labor relations, the majority fails to appreciate the significance of section 20.7, and the fact that it has no counterpart in the federal statutes. *City of Fort Dodge v. Iowa Public Employment Relations Board*, 275 N.W.2d 393, 395 (Iowa 1979).

To insure that its intention in section 20.7 would not be ignored, the legislature added subsection 20.17(6):

> No collective bargaining agreement or arbitrators' decision shall be valid or enforceable if its implementation ... would substantially impair or limit the performance of *any statutory duty by the public employer.*

(Emphasis added.)

It seems plain enough that the public employer could not retain the section 20.7 "exclusive" duty to suspend or discharge public employees if it were permitted to dicker this duty away for the term of a collective bargaining agreement—perhaps for years—and then to surrender that decision to an arbitrator over whom the public has no power.

The public employer's exclusive duty to discipline by suspension or discharge clearly would encompass lesser discipline such as withholding a pay increase. The reserved contractual right of the school district "to withhold salary increases for unsatisfactory performance" is nothing more than a recognition of this concept, and in light of section 20.7, it is an unnecessary reservation of the board's disciplinary duty. That section is, of course, an integral part of this bargaining agreement by statute, section 20.28, and by our case law. *See, e.g., State ex rel. Turner v. Koscot Interplanetary, Inc.*, 191 N.W.2d 624, 630 (Iowa 1971); *Cornick v. Southwest Iowa Broadcasting Co.*, 252 Iowa 653, 656, 107 N.W.2d 920, 921 (1961) ("[E]xisting statutes and the settled law of the land are a part of every contract, and must be read into it as though it were specifically referred to therein.").

To hold that the board had the power to leave the disciplinary duty imposed exclusively upon it to the unbridled discretion of an arbitrator would violate the obvious legislative intent in Iowa Code section 20.7 and subsection 20.17(6). To hold that a public employer may delegate the subsection 20.7(3) "just cause" (in this case, "un-

satisfactory performance") determination to the final decision of an arbitrator who is totally unresponsible to the public is a similar emasculation of the exclusivity concept undergirding section 20.7. "Just as a contractual provision to directly violate the law is void, a contractual provision conferring upon a third party the power to interpret the contract in such a manner that a violation will occur is also void." *Wisconsin Employment Relations Commission v. Teamsters Local No. 563*, 75 Wis.2d 602, 612–13, 250 N.W.2d 696, 701 (1977). It is unfortunate that the majority brushes aside consideration of Iowa's Constitution and statutes, and the protection of the public's right to control and secure delivery of indispensable and crucial government services. It is even more unfortunate that it addresses these issues with the principles and standards that would apply in an ordinary labor dispute involving, for example, Metz Baking Company or Armour Pack.

This case does not require us to decide what recourse an employee would have if dissatisfied with a public employer's "just cause" determination. Most city employees have recourse to the civil service commission, Iowa Code section 400.27, followed by de novo hearing in the trial court and de novo appellate review. *See Sieg v. Civil Service Commission*, 342 N.W.2d 824, 827–28 (Iowa 1983). It is anomalous, if not without equal protection implications, to hold other public employers and employees are without recourse to the courts.

I would hold, under Iowa Code subsection 20.17(6), that neither this collective bargaining agreement as construed by district court nor the arbitrator's decision is valid and enforceable because each would "substantially impair or limit" this board in "the performance of [its] statutory duty" under subsection 20.7(3).

II. Assuming without conceding the applicability of the federal case law adopted in *Sergeant Bluff-Luton Education Association v. Sergeant Bluff-Luton Community School District*, 282 N.W.2d 144 (Iowa 1979), and transferred there to the Iowa public sector despite its base in different labor relations statutes, the arbitrator's award nonetheless did not "draw its essence" from the agreement.

Even under the federal case law

an arbitrator is confined to interpretation and application of the collective bargaining agreement; he *does not sit to dispense his own brand of industrial justice*. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. *When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.*

*United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424, 1428 (1960) (emphasis added).

The reviewing court's role has been characterized as follows:

[T]o determine whether the arbitrator has resolved the grievance by considering the proper sources—"the contract and those circumstances out of which comes the 'common law of the shop' "— but not to determine whether the arbitrator has resolved the grievance correctly.

*Jacinto v. Egan*, 120 R.I. 907, 391 A.2d 1173, 1176 (1978) (quoting R. Gorman, *Basic Text on Labor Law* 585 (1976)); *Safeway Stores v. Bakery Workers International Union Local 111*, 390 F.2d 79, 82 (5th Cir.1968).

There is nothing in Iowa Code chapter 20 that suggests the special deference the majority accords an arbitrator's decision. Iowa Code subsection 20.17(6) implies the legislature intended a closer scrutiny, as does our general arbitration act, which provides that in certain circumstances an arbitration award may be vacated by the court where "[s]ubstantial evidence on the record as a whole does not support the award." Iowa Code § 679A.12(1)(f) (1983).

The reason usually cited for this special deference to arbitrators is their special competence. They are able, it is said, to understand industrial relations problems as judges are not. They are

familiar with "the common law of the shop." I suggest that these explanations are, in many cases, about as accurate as the statement that arbitration is an informal and expeditious procedure. There is a measure of truth in them, but not much. Arbitration can be, and sometimes is, informal and expeditious. At other times it is as formal and time-consuming as litigation. Similarly, some arbitrators do have some special insight into the ways of doing things in an industrial plant; but in many other cases they don't. Clearly an ad hoc arbitrator, who comes in to decide a grievance in a particular shop which he has never seen before and may never see again, has no special knowledge of the "common law" of that shop.

Feller, *Arbitration: The Days of Its Glory are Numbered,* 2 Indus.Rel.L.J. 97, 98 (1977).

Turning to the factual background of this controversy, Bristol was a social studies teacher in an Iowa City junior high school. Dr. Ferguson was the principal and was found by the arbitrator to be "an especially well-qualified teacher in the very subject-matter involved." Ferguson evaluated Bristol's teaching over an extensive period using the exhaustive criteria of an evaluation form employed to evaluate all teachers. Bristol's teaching performance was not satisfactory in over 76 percent of the areas rated. The exhibits in the record show excessive "teacher talk" and lack of student participation were brought to Bristol's attention in 1973, 1974, 1975, 1977, 1979 and 1980. The need to eliminate extraneous personal beliefs or unrelated "tangents" in class was discussed in 1977, 1978, 1979 and 1980. In 1974, 1975, 1977, 1979 and 1980, Bristol was directed to plan and execute classroom objectives, directions, instructions and assignments. Ferguson brought student and parent complaints to Bristol's attention in 1976, 1977, 1978 and 1979. In 1979 and 1980 Bristol was repeatedly cautioned about his many classroom absences in violation of school rules. Of twelve documented classroom absences in December 1979, and seven in January 1980, four were for the purpose of getting "coffee water."

The arbitrator's decision states:

Dr. Ferguson, the principal, notably made a conscientious and extensive effort to monitor and evaluate the Grievant's performance. Not only was he cloaked with the managerial responsibility of the principal, but he also is an especially well-qualified teacher in the very subject-matter involved. Therefore, *there is lacking any basis for reversal or modification of the District's actions* with respect to the Grievant *on the grounds* that *it was arbitrary and unjustified.*

(Emphasis added.) Nonetheless, the arbitrator did reverse the district's action on the ground of Bristol's long tenure. Repeated emphasis was placed on this teacher's long service in the district, the fact his progression was "halted tantalizingly close to the 14th and last rung of the ladder," and the severe criticism that was coming "on the very threshold of his advancement to the top rung of the scale." The portion of the arbitrator's ruling quoted by the majority as holding Bristol's teaching was satisfactory discloses the arbitrator's basic rationale: Failure to apply "long-term standards" would render "the principles of teacher tenure ... illusory."

The arbitrator spent much of his decision discussing a Vermont arbitration, *Board of School Commissioners of Rutland* (VT) (AAA Case No. 1130–1391–78), the only authority he cites for his decision. He pointed out the grievant in that case "did not adequately prepare his study programs and did not plan his presentations both of which are deficiencies cited repeatedly against the Grievant in the instant case." Nonetheless, the Vermont arbitrator was quoted as observing that "non-renewal or termination of a teacher after seven years' service is a matter of utmost severity." The Vermont decision was further approvingly quoted as applying "[a] fundamental notion of fairness in labor relations ... that a long term employee may not be terminated without at least a fair and bal-

anced review of his record *over the term of his employment.*" (Emphasis supplied by Iowa arbitrator.)

It is of more than passing interest that the arbitrator's concern for Bristol's tenure caused him to underscore only this phrase in the entire course of his decision. Of course the "fundamental notion of fairness in labor relations," applied in Vermont and adopted by this arbitrator—in essence requiring an "averaging out" of the employee's record over the entire term of his or her employment—is in conflict with the Iowa law of district-teacher employment relations found in our interpretive decisions.

Although this court has raised the principle of fairness in arbitration cases, it has done so only insofar as it relates to "vaguely defined concepts *of the particular industry.*" *Sergeant Bluff-Luton Education Association,* 282 N.W.2d at 150 (emphasis added); *see Enterprise Wheel & Car Corp.,* 363 U.S. at 596, 80 S.Ct. at 1360, 4 L.Ed.2d at 1427–28. The voluminous record consisting of exhibits and the filings in this case contains no evidence tending to show that longevity is a salient consideration in educational employment or in the past practices of these parties, or raising any claim to that effect. Our prior decisions hold to the contrary.

In *Briggs v. Board of Directors,* 282 N.W.2d 740, 743 (Iowa 1979), affirming the discharge of an administrator employed fourteen years and discharged for incompetence over a five-year period, we wrote:

> It is sufficient here to hold that in the context of teacher fault a "just cause" is one which directly or indirectly significantly and adversely affects what must be the ultimate goal of every school system: high quality education for the district's students. ... It must include the concept that a school district is not married to mediocrity but may dismiss personnel who are neither performing high quality work nor improving in performance.

This philosophy permeates Iowa's appellate decisions. *See Board of Directors v. Mroz,* 295 N.W.2d 447, 449 (Iowa 1980) (quoting *Briggs*); *Board of Education v. Youel,* 282 N.W.2d 677 (Iowa 1979) (teacher employed 25 years discharged for improper handling of program); *Cook v. Plainfield Community School District,* 301 N.W.2d 771, 773 (Iowa Ct.App.1980) (quoting a portion of the above passage from *Briggs* in rejecting the concept that the prime goal of teacher termination statutes is job security); *Fay v. Board of Directors,* 298 N.W.2d 345, 348 (Iowa Ct.App.1980) (several years of favorable reports mentioned but assigned no weight in teacher termination case).

Perhaps in private sector labor relations the "fundamental notion of fairness" referred to by the arbitrator might arguably permit balancing an employee's past satisfactory record against his or her present unsatisfactory performance. For example, the damage created by an employee unsatisfactorily making widgets might be minimized by records of unit production and careful, objective quality control inspections. In the profession of teaching, however, there is a basic overriding unfairness in balancing past satisfactory teaching against present malpractice affecting a new crop of young minds each and every year.

Even under the private sector federal case law the majority opinion adopted in *Shenandoah Education Association v. Shenandoah Community School District,* 337 N.W.2d 477, 481 (Iowa 1983), when an arbitration decision arrives before the court for enforcement, the court may be required to examine whether it "drew its essence" from the collective bargaining agreement, or merely dispensed the arbitrator's "own brand of industrial justice." Although the amorphous "essence" concept permits wide arbitrator discretion, it is not without ultimate parameters. The "considerations of fairness" that may be invoked by the arbitrator are linked to "concepts of the particular industry." *Sergeant-Bluff,* 282 N.W.2d at 150. The common law underlying the agreement also must be "the common law of a particular industry," *United*

*Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 579, 80 S.Ct. 1347, 1351–52, 4 L.Ed.2d 1409, 1415 (1960). In this case the "particular industry" is public school education. The common law of this "industry" in Iowa includes the concept so often articulated in interpreting teacher termination statutes: The focus must be on present performance, not on past tenure.

In this case the arbitrator's decision turned on a "notion of fairness in labor relations" that not only was foreign to public education in Iowa, but stood the applicable common law of this state on its head. In so doing the arbitrator departed from "the areas marked out for his consideration," *Enterprise Wheel & Car Corp.*, 363 U.S. at 598, 80 S.Ct. at 1361, 4 L.Ed.2d at 1429, and impermissibly substituted his "own brand of industrial justice." *Id.* at 597, 80 S.Ct. at 1361, 4 L.Ed.2d at 1428; *Sergeant-Bluff*, 282 N.W.2d at 149.

I suggest that the review of an arbitrator's decision in cases involving a vital, basic, and monopolistic public function—the education of children—requires something more than the total abdication of the judicial function. The implication in the majority's opinion that this arbitrator's ruling is ad hoc and will, after all, affect only these parties and only the children of Iowa City has no basis in fact and practice. Arbitration rulings result in a wide-ranging substratum of decisional law that may, as in this case, reverse our own case law, based though it is on the legislature's statutory intent. Yet, under the majority's view, these rulings are immune from judicial correction.

This arbitrator's heavy reliance on a Vermont arbitration proceeding is an example. That an Iowa arbitrator should have access to such a ruling is not surprising: Publishing arbitration awards has become a big business.[1] What is surprising is that no attempt was made to demonstrate that a Vermont decision should have applicability in Iowa. Vermont's public policy on education and the weight, or lack of weight, given teacher tenure there may differ substantially from Iowa practice.

In the private sector, arbitrators long have employed the practice of citing awards arising not only outside the relevant locality, but also outside the relevant industry. *See* Shulman, *Reason, Contract, and Law in Labor Relations*, 68 Harv.L. Rev. 999, 1020 (1955) ("I am not referring to the use in one enterprise, say United States Steel, of awards made by another arbitrator in another enterprise, say General Motors. Because the publishing business has made arbitration awards generally available, they are being used in this way both by the parties and by arbitrators.").[2]

This extensive practice of cross-industry borrowing ought to make a reviewing court question the extent to which any arbitrator truly relies on "the industrial common law—the practices of the industry and the shop." *Warrior & Gulf Navigation Co.*, 363 U.S. at 581–82, 80 S.Ct. at 1352, 4 L.Ed.2d at 1417. The more serious problem, however, is that the damage is not confined to a single case.

The majority concedes that "[M]istakes of either fact or law are among the contingencies the parties assume when they submit a dispute to arbitration." The mistake of law is multiplied, however, under the majority's view that arbitrators may proceed unchecked to incorporate each other's mistakes into an ever-growing body of their own private law. These "mistakes of law" soon will become controlling for the public employer and employees in Iowa.

While I do not concede the private industry scope of review should be applied in arbitration cases arising under Iowa's Public Employment Relations Act, I believe

1. The Bureau of National Affairs already has published seventy-nine bound volumes of *Labor Arbitration Reports,* and Commerce Clearing House produces at least two volumes of *Labor Arbitration Awards* annually.

2. For an example of this practice, see *AMF Western Tool, Inc.,* 49 Lab.Arb. (BNA) 718, 723–24 (1967) (Solomon, Arb.). There, the arbitrator cites awards involving five different employers and makes no attempt to define the business or business practices of any.

that even the application of the majority's standard should produce a different result. This conclusion finds support in cases from other jurisdictions in which arbitrators have been found to be dispensing their "own brand of industrial justice."

In *Sears, Roebuck and Co. v. Teamsters Local Union No. 243*, 683 F.2d 154 (6th Cir.1982), *cert. denied*, — U.S. —, 103 S.Ct. 1274, 75 L.Ed.2d 495 (1983), an award was vacated because of the arbitrator's extra-contractual imposition of a "balancing test" in interpreting a provision allowing the employer to subcontract only if the subcontracted work could be "performed more efficiently and economically outside of the bargaining unit." *Id.* at 155. In *Caribou Board of Education v. Caribou Teachers Association*, 404 A.2d 212 (Me. 1979), the arbitrator was interpreting a contract provision requiring the district to provide art and music specialists in the elementary schools. The district unilaterally terminated the kindergarten classroom visits of the music teacher, and the court vacated an arbitrator's award requiring the district to negotiate before making such personnel changes. The court held that the negotiation requirement had "no basis in" the agreement there being interpreted, *id.* at 215. In *County of Allegheny v. Allegheny County Prison Employees Independent Union*, 476 Pa. 27, 381 A.2d 849 (1977), the arbitrator reinstated past lunch privileges of the protesting employees, despite contractual silence on the question at issue. The court found the reinstatement was barred by the integration clause of the collective bargaining agreement and concluded that the arbitrator was drawing his award, not from the contract, but from "his conviction of what was fair and reasonable," *id.* at 38, 381 A.2d at 855.

Finally, in *Simpson v. North Collins Central School District*, 56 A.D.2d 166, 171–72, 392 N.Y.S.2d 107, 110 (1977), *aff'd*, 43 N.Y.2d 976, 375 N.E.2d 776, 404 N.Y. S.2d 596 (1978), the arbitrator was interpreting a contract provision allowing the district to discharge its teachers for just cause. The court vacated the arbitrator's award, holding "that the arbitrator's imposition of ex post facto procedural standards for the evaluation of the grievants was tantamount to the making of a new contract for the parties, and was therefore in excess of his powers." In the case before us, this arbitrator's imposition of an averaged ex post facto multi-year evaluation system for Iowa City's teachers was similarly in excess of his powers, and it should not be allowed to stand.

I would affirm the decision of the court of appeals on this issue, reverse the district court, and void the arbitrator's ruling.

III.   In addition, I am convinced the arbitrator's decision in this case should be voided as violating public policy. In construing and applying Iowa Code chapter 20, we have a right to consider the historical and settled public policy of this state "to foster, encourage, and promote the education of its youth." *State v. Bartels*, 191 Iowa 1060, 1067–68, 181 N.W. 508, 512 (1921), *rev'd on other grounds*, 262 U.S. 404, 43 S.Ct. 628, 67 L.Ed. 1047 (1923).

We address this issue against the backdrop of demand for better secondary education which recently has riveted the attention of educators, politicians and citizens on both the state and national level. At a time when every competent teacher, administrator, parent and concerned citizen is seeking ways to award and retain good teachers and to eliminate poor teachers, it is anomalous indeed for this court to put its stamp of approval on an arbitrator's decision that not only emasculates our statutes, but also takes a mighty step backwards in its educational implications.

A public policy is manifested in Iowa Code subsection 20.17(6) ("No collective bargaining agreement or arbitrators' decision shall be valid or enforceable if its implementation ... would substantially impair or limit the performance of any statutory duty by the public employer."), examined in division I. This statute plainly directs court action where the exclusive duty imposed on the public employer in subsection 20.7(3) is negated. Pertinent here is the following from *Board of Education*

*Great Neck Union Free School District v. Areman,* 41 N.Y.2d 527, 531, 534, 362 N.E.2d 943, 946, 948, 394 N.Y.S.2d 143, 146, 148 (1977):

> Different from private matters where freedom to contract is virtually unlimited, public school matters are, from time to time, subject to restrictive policies which reflect governmental interests and public concerns. Boards of education are but representatives of the public interest and the public interest must, certainly at times, bind these representatives and limit or restrict their power to, in turn, bind the public, which they represent.
>
> . . . .
>
> In conclusion we repeat that a board of education cannot bargain away its right to inspect teacher personnel files and that a provision in a collective bargaining agreement which might reflect such a bargain is unenforceable as against public policy.

(Citations omitted.)

Another public policy is found in our Iowa Code chapter 279 statutes involving teacher tenure, fleshed out and interpreted by our decisions cited in division II. In those decisions we construed these statutes to define the nuances of "just cause" for termination, and held prior satisfactory performance will not offset present performance that significantly and adversely affects high quality education for a district's students. Surely the same public policy considerations must apply in the context of a simple disciplinary measure invoked to attract a teacher's attention to similar deficiencies after repeated admonishments have been ignored. The significant public policy violation here, however, occurred when the arbitrator applied this policy in reverse, excusing present poor performance by the irrelevant fact that the teacher had been long on the scene.

I would void the arbitrator's ruling as violating the public policy incorporated in Iowa Code subsections 20.7(3) and 20.17(6), and the teacher tenure statutes of Iowa Code chapter 279 as interpreted by our decisions. This necessitates a reversal of the district court decision and an affirmance of the opinion of the court of appeals.

UHLENHOPP, McGIVERIN and SCHULTZ, JJ., join this dissent.