CHARLES CITY COMMUNITY SCHOOL DISTRICT, Appellee,

v.

PUBLIC EMPLOYMENT RELATIONS BOARD, Appellant.

No. 61780.

Supreme Court of Iowa.

Feb. 21, 1979.

Thomas J. Miller, Atty. Gen., Carlton G. Salmons, Asst. Atty. Gen., and Nancy D. Powers, of the Public Employment Relations Bd., Des Moines, for appellant.

Ralph F. McCartney and Judith M. O'Donohoe, of McCartney & Erb, Charles City, for appellee.

Charles E. Gribble, of Dreher, Wilson, Adams & Jensen, Des Moines, for amicus curiae, Iowa State Ed. Ass'n.

Edgar H. Bittle, of Belin, Harris, Helmick & Lovrien, Des Moines, for amicus curiae, Iowa Ass'n of School Boards.

McGIVERIN, Justice.

In this appeal we must decide whether two contract proposals made by a public employee organization in collective bargaining negotiations with a public employer are mandatory subjects for bargaining under § 20.9 of the Public Employment Relations Act (PERA), Chapter 20, The Code, 1977. The trial court ruled they were not mandatory subjects. We affirm in part and reverse in part.

Petitioner Charles City Community School District, a public employer within the meaning of § 20.3(1), has been engaged in collective bargaining with an "employee organization" within the meaning of § 20.-3(4). During negotiations the parties disagreed as to whether certain proposals by the employee bargaining representative were mandatory subjects of bargaining under § 20.9. The employees claimed the proposals were mandatory subjects of bargaining and therefore the negotiation of the proposals was a condition precedent to a collective bargaining agreement. The District did not voluntarily negotiate on the proposals and claimed that, since the proposals were outside the scope of bargaining set forth in § 20.9, there was no statutory obligation to negotiate.

A prohibited practice complaint was filed by the public employer under § 20.11 with the Public Employment Relations Board (PERB). The complaint alleged the insistence upon inclusion in the collective bargaining agreement of permissive subjects violated §§ 20.10(3)(b) and (c). In a recommended decision and order a PERB hearing officer ruled the proposals are mandatory subjects of bargaining. On appeal the Board sustained the ruling and held the two proposals are mandatory subjects for bargaining.

The public employer petitioned in district court under § 17A.19 for judicial review of the respondent Board's ruling. The court reversed the Board's decision and held the two proposals are not mandatory subjects for bargaining under § 20.9.

The Board has appealed under § 17A.20.

Section 20.9 provides in part as follows:

Scope of negotiations. The public employer and the employee organization shall meet at reasonable times, including meetings reasonably in advance of the public employer's budget-making process, to negotiate in good faith with respect to *wages, hours, vacations, insurance, holidays, leaves of absence, shift differentials, overtime compensation, supplemental pay, seniority, transfer procedures, job classifications, health and safety matters, evaluation procedures, procedures for staff reduction, in-service training and other matters mutually agreed upon. Negotiations shall also include terms authorizing dues checkoff for members of the employee organization and grievance procedures for resolving any questions arising under the agreement,* which shall be embodied in a written agreement and signed by the parties. If an agreement provides for dues checkoff, a member's dues may be checked off only upon the member's written request and the member may terminate the dues checkoff at any time by giving thirty days' written notice. Such obligation to negotiate in good faith does not compel either party to agree to a proposal or make a concession. (Emphasis added.)

The two proposals in question are:

1. That medical and health insurance coverage be provided by the employer for family members and dependents of employees.

2. That grievance committee members of the employees organization be allowed to investigate and process grievances of employees during working hours and without loss of pay by the committee members while so acting.

Our inquiry on appeal is limited to a determination of whether either or both of the proposals are mandatory subjects of negotiation under § 20.9. Although the PERA provisions governing the duty to bargain became effective July 1, 1975, we have been asked only recently to rule on the scope of the duty to bargain outlined in § 20.9. Compare *City of Fort Dodge v. Iowa Public Employment Relations Board*, 275 N.W.2d 393 (Iowa 1979).

Subjects of bargaining are divided into three categories. There are mandatory subjects on which bargaining is required if requested;[1] permissive subjects on which bargaining is permitted but not required; and illegal subjects on which bargaining is precluded by law. The list of subjects set out in § 20.9 constitutes mandatory subjects on which the parties are required to bargain if requested.

■ We do not decide whether a particular contract proposal is fair or financially reasonable and leave those determinations to the parties or the arbitrator, if the parties cannot reach agreement on terms. We look only at the subject matter and not the merits of the proposals at issue.

■ Although we give weight to the interpretation by the Board, we are not bound by Board interpretations of law and must make an independent determination of the meaning of the statute. *Iowa State Education Association v. PERB*, 269 N.W.2d 446, 447 (Iowa 1978); *West Des Moines Education Association v. PERB*, 266 N.W.2d 118, 124–125 (Iowa 1978).

I. *Background and perspective.* In contrast to private sector collective bargaining, public sector collective bargaining is a relatively new area in the field of economic interaction. Courts in may jurisdictions have examined public employment relations statutes over only a brief period of time.

At this early stage of analysis of public employment relations acts, however, there have emerged divergent views on how the statutes should be construed. The divergence of views centers, at least in part, on the appropriate degree of limitation to be placed on the scope of subjects mandatorily includable in the bargaining process.

The ideological differences between those who advocate a carefully limited scope of negotiations and those who advocate a broad scope of negotiations were recently stated in Note, *The Scope of Negotiations under the Iowa Public Employment Relations Act*, 63 Iowa L.Rev. 649, 653–660 (1978). The positions of each ideological camp were summarized, in part as follows:

The proponents of a carefully delimited scope of negotiations for the public sector maintain that a broad range of bargaining subjects would work in derogation of the public interest. It is feared that unless the scope of bargaining is limited, public employee unions will gain disproportionate political power. There is also concern that traditional methods of political control over and accountability for the management of "public benefit conferral" will be distorted. Although most scope limiters accept, at least begrudgingly, the need for collective determination of some aspects of the public employment relationship, they contend that the reasons warranting the imposition of public employment collective bargaining in the first instance do not justify negotiations over a wide range of subjects. The differences between the public and private sectors are perceived as making inapplicable for public bargaining the private sector experience of a fairly broad scope of bargaining determined and interpreted primarily by adjudicatory bodies.

At the core of the attitudes of those who favor a limited scope is a view of the democratic process that emphasizes that decisions concerning public programs should be made by persons accountable to the public. A broad scope of negotiations

1. Compare §§ 20.10(1); 20.10(2)(e); 20.10(3)(c).

is felt to threaten the control of public officials and the accountability attendant to that control. It also changes existing methods of decision making, and the outcomes of that decision making, to a greater extent than is acceptable. Before public sector bargaining, the working conditions and wage-related benefits of public employees were unilaterally determined by public sector employers. The governmental nature of the enterprises suggests to scope limiters that the method of determination of certain aspects of the public employment relationship is at least theoretically suited to the democratic process. Government employers are responsible to a broad range of interest groups, and resource allocation of decisions usually must reflect more than simple consideration of economic criteria.

. . . . .

In contrast to those commentators who view the differences between the public and private sectors as necessitating a legislatively limited scope of negotiations for public sector collective bargaining, the opposing side of the debate favors adoption of the private sector model. These private sector advocates recognize sector differences, but take the view that employees of the public are "primarily employees" and only secondarily government employees. It is believed that the fact that the government is the employer should not inhibit employees' legitimate aspirations for a voice in the determination of working conditions.

Advocates of a broad scope of negotiation challenge, though seldom explicitly, the notion that public enterprise management absent collective bargaining is meaningfully accountable to the public will. The tendency of bureaucracy to insulate public officials' acts from public control . . . and the low level of public interest in many matters of local governmental policy all work against the existence of significant accountability. Because the existence of meaningful accountability is questioned, fewer positive values are seen as threatened by allowing the determination of a wide

scope of issues bilaterally through collective negotiations.

Absent meaningful managerial accountability, broad scope advocates see the initial legislative decision to allow public sector collective negotiations as nearly dispositive of the issue of the scope of bargaining. Less than full bargaining over broad areas of the employment relationship hinders the ability of the process to achieve the goals for which it was adopted. It has been suggested that collective bargaining in the public sector should be an all-or-nothing policy choice; that the process should either be allowed to operate fully or it should be denied existence.

. . . . .

One of the most articulate policy statements in case law is found in the recent Wisconsin case of *Unified School District v. Wisconsin Public Employment Relations Commission*, 81 Wis.2d 89, 259 N.W.2d 724 (1977). The Wisconsin court was faced with a determination of the mandatory bargaining nature of a school district's decision to subcontract part of its food service program to a private corporation. In interpreting the municipal employment relations act provision defining "wages, hours and conditions of employment" as the bargaining scope, the court rejected state level private sector precedent and said:

There are important economic and policy reasons why the legislature would distinguish between collective bargaining in the public sector and the private sector:

' ". . . In the private sector, union demands are usually checked by the forces of competition and other market pressures. Negotiators are typically limited by such restraints as the entry of nonunion competitors, the impact of foreign goods, the substitution of capital for higher-priced labor, the shift of operations to lower-cost areas, the contracting out of high-cost operations to other enterprises, the shutdown of unprofitable plants and operations, the redesign of products to meet higher costs, and finally the managerial option to go out of busi-

ness entirely. Similar limitations are either nonexistent or very much weaker in the public sector. While budgets and corresponding tax levies operate in a general way to check increases in compensation, the connection is remote and scarcely applicable to particular units of groups of strategically located public employees . . . ." Cox and Bok, Labor Law (7th ed.), pages 970, 971.' quoted in *Hortonville Ed. Assn. v. Joint Sch. Dist. No. 1*, 66 Wis.2d 469, 485, 225 N.W.2d 658, 666 (1975), rev'd on other grounds, 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976).

Moreover, governmental employers perform a substantially different role than do private employers, and there are different reasons for according them certain prerogatives. In the private sector, collective bargaining is limited by the need to protect the 'core of entreprenurial control,' particularly power over the deployment of capital. If resources are to be employed efficiently in a market economy, capital must be mobile and responsive to market forces.

.     .     .     .     .

In the public sector, the principal limit on the scope of collective bargaining is concern for the integrity of political processes. 259 N.W.2d at 730.

An initial policy determination is made on the scope of public sector bargaining when statutory language defining mandatory subjects is enacted. The federal statute, National Labor Relations Act (NLRA), governs private sector bargaining and broadly defines mandatory subjects as those falling within the category of "wages, hours and other terms and conditions of employment." 29 U.S.C. § 158(d) (1970). Although many states have opted to apply the federal model to public employment,[2] Iowa expressly rejected the federal language. The Iowa Senate version of the 1973 proposed act adopted the federal language verbatim. 65th G.A., Senate Journal at 1295–1996 (1973). However, a subsequent House amendment removed the federal language and substituted the existing list of mandatory subjects. 65th G.A., House Journal at 555–834 (1974). PERA, ultimately, passed both houses in the amended form. 1974 Iowa Acts, ch. 1095 at 274.

The specific enumeration of mandatorily bargainable subjects would appear to reflect a legislative determination to place Iowa in the camp of those who advocate a limited scope of negotiations in the public sector. Support for the limited scope view exists in principles of statutory construction found in 2A Sutherland Statutory Construction, § 47.23 at 123 (4th ed. 1973):

> Where a form of conduct, the manner of its performance and operation, and the persons and things to which it refers are designated, there is an inference that all omissions should be understood as exclusions.

In Pope, *Analysis of the Iowa Public Employment Relations Act*, 24 Drake L.Rev. 1, 33–34 (1974), Professor Lawrence E. Pope generally takes the position that the Iowa detailed list is an attempt to restrict mandatory subjects of bargaining. He states:

> The important question is what constitutes mandatory subjects of collective bargaining. The author's view is that mandatory subjects include only those subjects listed in § 9 plus "other matters mutually agreed upon." An opposing view would suggest that other matters which are of interest to employees and employee organizations, and which are not illegal topics, are mandatory subjects of collective bargaining.

> Which view is correct depends on the assigned role of the enumerated list in § 9. If the list is meant to be *descriptive*, to describe the kinds of things employee organizations will want to bargain about, then the range of mandatory subjects expands to include topics like those on the

2. See, e. g. Fla.Stat.Ann. § 447.309 (Supp.1978); Hawaii Rev.State. § 89–9 (1976); Ind.Code Ann. § 22–6–4–1(k) (Burns Supp.1978); Mich. Comp.Laws Ann. § 423.215 (1978); Pa.Stat. Ann. tit. 43 § 1101.701 (Purdon Supp.1978). For examples of jurisdictions which have substantially adopted the federal language, compare: N.H.Rev.Stat.Ann. § 273–A:1–3 (1977); Me.Rev.Stat.Ann. tit. 26 § 965 (1964); Mont. Rev.Code Ann. § 59–1605 (Supp.1977); Wis. Stat.Ann. § 111.91 (West Supp.1974).

list. The more correct view is that the list *defines* the scope of mandatory subjects. If the topic is not on the list, the employer cannot be forced to bargain about it.

There are several reasons for this latter view. First, lists are generally definitional. Where the General Assembly goes to the trouble of providing a list it generally means to exclude those topics or terms not on the list.

Second, the General Assembly did permit the list to expand. The language in § 9—"other matters mutually agreed upon"—indicates that other topics can be added with agreement of both parties; logically, it also suggests a boundary to the territory of mandatory subjects. If a subject is not on the list, it can be prevented from being bargained upon by raising a timely objection when it is brought up at the bargaining table.

Third, § 9 must be viewed in conjunction with § 7 of the Act. As discussed in part II of this article, § 7 contains an extremely broad list of employer rights. Nearly all legitimate functions of a public employer are covered. Section 9 should properly be viewed as providing exceptions to § 7. Therefore, as with most exceptions, if a subject is not specifically listed, it must be assumed that the intent of the legislature was to exclude it.

Fourth, the original Senate file 531, § 9, contained a clause, "and other terms and conditions of employment." That language is identical to that found in the NLRA, and has been interpreted as opening up greatly the category of mandatory subjects. This clause was removed from § 9 by the House, and the list was substituted. Had the House meant the list to be descriptive only, it could have kept the original language and left the Board to rely on federal case law since the NLRA language was identical.

Finally, legislative debate in the House left little doubt that the intent of the amendment substituting the list for the broad language in Senate file 531 was that the list would be exclusive.

█ We are persuaded that the rejection of NLRA language and adoption of a specific list of mandatory subjects evidences a legislative intent to exclusively define rather than describe the scope of bargaining under PERA. This conclusion harmonizes with what we perceive to be sound policy reasons for distinguishing between public and private sector bargaining.

Our adoption of the view that § 20.9 exclusively defines mandatory subjects does not, however, resolve the issue of whether each term enumerated must, itself, be narrowly construed. In sorting out the policy views on collective bargaining and the plausible constructions of the § 9 list of mandatorily bargainable subjects, it is helpful to turn to other jurisdictions which have been faced with interpretive decisions under their own public employment relations statutes.

Several jurisdictions have expressly either embraced or rejected utilization of broad NLRA precedent in construing public employment relations statutes. Often the determination of the applicability of NLRA case law has turned on linguistic comparisons rather than policy choices. Cf. *Detroit Police Officers Assoc. v. City of Detroit,* 391 Mich. 44, 214 N.W.2d 803, 807 (1974) (followed federal precedent and broadly construed the scope of negotiations); *Fire Fighters Union, Local 1186, International Association of Fire Fighters, AFL–CIO v. City of Vallejo,* 12 Cal.3d 608, 116 Cal.Rptr. 507, 526 P.2d 971 (1974) (followed federal precedent and broadly construed the scope of negotiations); *International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 320 v. City of Minneapolis,* 302 Minn. 410, 225 N.W.2d 254, 257 (1975) (rejected federal precedent but otherwise followed broad scope construction).

Some states follow broad scope construction of statutory terms to offset the impact of no-strike clauses in their statutes.[3] See,

---

3. The Iowa PERA, § 20.12, states strikes by public employees against any public employer shall be unlawful.

*Id.*, 225 N.W.2d at 257. However, as further stated in Note: *The Scope of Negotiations Under the Iowa Public Relations Act*, 63 Iowa L.Rev. 649, 664–665:

> The fact that public sector strikes are often legally banned is a further argument of broad scope advocates that negotiations should be allowed on a broad range of subjects. This denial of the employees' most effective bargaining weapon is seen as justifying broader scope. The contention is subject to challenge, however, where compulsory arbitration is an available alternative.

■ We conclude from the legislative history of § 20.9 and the cogent policy arguments for distinguishing public and private sector bargaining that the Iowa legislative intent was to adopt a restrictive approach to interpreting the subjects listed in § 20.9.

We turn to the specific bargaining proposals before us.

■ II. *The insurance proposals.* The employee organization contends the public employer must mandatorily bargain under § 20.9 as to the employees' proposal that medical and health insurance coverage be provided at the cost of the employer for dependents and family members of employees.

In considering whether a proposal to provide dependent health insurance coverage to employees is within the mandatory scope of bargaining under § 20.9, a two-step analysis is required. First, the proposal must come within the meaning of "insurance" under § 20.9. Second, the proposal must not be illegal; that is, there must be no legal prohibitions against a school district providing such a benefit to its employees.

Although § 20.9 requires the parties to negotiate in good faith with respect to insurance, the term is not further defined in chapter 20. We must, therefore, look elsewhere for the meaning of "insurance".[4]

Chapter 279, which pre-dates chapter 20, is helpful in illuminating the meaning of

the term. Under § 279.12 school districts are empowered to:

> Establish and pay all or any part thereof from school district funds the costs of group health insurance plans, non-profit group hospital service plans, non-profit group medical service plans and group life insurance plans adopted by the board for the benefit of employees of the school district.

Section 279.12 makes clear that provision of both health and life insurance for school district employees was authorized before enactment of PERA. We believe the term has not been narrowed by its inclusion in PERA.

The determination that "insurance" under PERA must, at least, include health and life insurance does not answer the question of whether coverage may be extended to dependents and family members.

We are persuaded by the Board's view that the distinction between public employees and their dependents in provision of health insurance would be spurious, since the practical effect of dependent coverage is of direct and immediate benefit for the employee himself.

Although the District alleges such an extension of benefits would be illegal under §§ 279.12 and 509A.1, we perceive nothing illegal in dependent coverage. Section 279.-12 authorizes insurance coverage *for the benefit of the employee.* A proposal for medical coverage for an employee's dependents would benefit the employee who has a legal obligation to pay for necessities for his family. Section 509A.1 states the governing body of the school district may establish or procure group insurance, health or medical service for the *employees* of the district; however, nothing therein *prohibits* purchase of insurance for dependents of employees. Attorney General opinions have construed § 509A.1 to authorize payment of premiums for the employee only. See, 1976 Op.Att'y

---

4. The term has been broadly defined by federal case law. However, we have taken the position, supra, that linguistic differences between PERA and NLRA as well as policy choices between public and private sector bargaining cause us to adopt a more restrictive view of mandatory subjects of bargaining. We, therefore, do not view federal precedent as controlling.

Gen. at 602; 1974 Op.Att'y Gen. at 370. However, § 509A.1 pre-dates chapter 20. We do not believe § 509A.1 can restrict the scope of PERA.

Therefore, we conclude the insurance proposal by the employees that medical and health insurance coverage be provided for dependents and family members of employees is a mandatory subject of bargaining under § 20.9.

■ III. *The grievance procedure proposal.* The employee organization contends the public employer must mandatorily bargain under § 20.9 as to the employees' proposal that grievance committee members be allowed to investigate and process grievances for other employee organization members during working hours and without loss of pay by grievance committee members.

Under the two-step analysis previously utilized, we must first consider whether the proposal comes within the meaning of "grievance procedures for resolving any question arising under the agreement" as stated in § 20.9.

Section 20.9 provides negotiations shall also include "grievance procedures for resolving any questions arising under the agreement"; section 20.18 subsequently states the collective bargaining agreement may provide for grievance procedures for consideration of public employee grievances and of disputes over interpretation and application of collective bargaining agreements. Section 20.18 permits binding arbitration; however, the costs of such arbitration of grievances shall be shared equally by the parties. In the event no grievance procedures are provided in the collective bargaining agreement, the employee shall follow the grievance procedures established in Chapter 19A. We find no further discussion of grievance procedures in Chapter 20.

Although § 20.18 provides the cost of arbitration of grievances shall be shared equally by the parties, the proposal would effectively require the employer to pay the entire cost of processing grievances up to the point of arbitration. The language stated in § 20.18, therefore, indicates to us a legislative intent that the proposal not be a mandatory subject of bargaining under § 20.9.

The issue here is not whether the employer may bargain on the proposal. The question is whether the employer is compelled to bargain on the proposal with the mediation, fact finding and arbitration steps in the background in the event of inability to agree on the proposal, or some form thereof, in a collective bargaining agreement.

Because the utilization of work time involves management policies, we must examine § 20.7 of PERA.

Section 20.7, as relevant, provides:

Public employers shall have, in addition to all powers, duties and rights established by constitutional provision, statute, ordinance, charter, or special act, the *exclusive* power, duty, and *right* to:

1. Direct the work of its employees. (Emphasis supplied.)

In reconciling the rights of management with the union's position, the Board split two to one. Chairman Kolker dissenting, stated in part:

First, it is my opinion that payment of those wages does not constitute a grievance *procedure.* To the contrary, I believe that "procedure" in the context of grievance processing means the type and number of steps involved in resolution of a grievance. . . .

Second, there can be no doubt that management under (§ 20.7) of the Act has the absolute right to direct the work of its public employees. Thus, employees are obliged to perform whatever work assignments management decides to direct during a workday; the quid pro quo, of course, is wages. . . .

[T]he union's argument that grievance processing constitutes work assigned by management, for which they may demand wage negotiations, is not convincing to me. The simple reality is that an employee is *not* working for the employer while he or she prosecutes a case against that employer. He or she is *not,* for example, teaching school, enforcing laws, maintaining the employer's equipment, etc. Rather, that employee has ceased to be a producer of the employer's mission

or product. I cannot find anything in § 9 of the Act which compels management to negotiate the payment of wages to an employee who is not performing work assigned by management.

My conclusions are based not upon the "fairness" of the proposal submitted, but simply my opinion as to whether management, as a matter of law, is compelled to bargain upon it. Because I believe that management is required to negotiate only over wages for work assigned by it to an employee, and performed under its direction, it is my opinion that the specific proposal herein is a permissive subject of bargaining.

We find Chairman Kolker's view persuasive. If the word "exclusive" in § 20.7 is to have its ordinary meaning relative to the right to direct work of employees, the employer should not be compelled to bargain on a proposal that the employee members of the grievance committee be allowed to utilize work time to investigate and handle grievances rather than produce work for the employer. To require bargaining on processing grievances during work hours without loss of pay to grievance committee members limits the authority expressly granted to the employer under § 20.7. If § 20.7 and § 20.9 are to be harmonized, the proposal must be a permissive subject of bargaining rather than mandatory.

We conclude the proposal is not a mandatory subject of negotiation because it is not a "grievance procedure for resolving any questions arising under the agreement" and does violate the exclusive right of the employer to direct the work of its employees.

In reaching our conclusions we have considered the many contentions raised by the parties whether specifically mentioned or not and find none which persuade us to reach different conclusions.

In summary, we hold that as to petitioner school district:

1. The employee organization proposal that medical and health insurance coverage be provided by the employer for family members and dependents of employees is a mandatory subject of negotiation under § 20.9.

2. The employee organization proposal that grievance committee members of the employee organization be allowed to investigate and process grievances during working hours and without loss of wages is not a mandatory subject of negotiation under § 20.9.

Therefore, the case is affirmed in part and reversed in part.

AFFIRMED IN PART AND REVERSED IN PART.

All Justices concur except McCORMICK, UHLENHOPP and HARRIS, JJ., who dissent in part.

McCORMICK, Justice (dissenting in part).

I. As explained in division II of my dissent in *City of Fort Dodge v. Iowa Public Relations Board*, 275 N.W.2d 393 (Iowa 1979), filed separately this date, I do not believe the terms identifying mandatory subjects of bargaining should be given a narrow as opposed to ordinary meaning. Because I agree with the court that the insurance proposal in the present case comes within the ordinary meaning of insurance, I concur in that holding.

II. However, I do not agree that the grievance proposal falls outside the "grievance procedures" subject matter for mandatory bargaining under § 20.9. The proposal is: "That grievance committee members be allowed to investigate and process grievances during working hours and without loss of wages." We do not pass on the merits of the proposal; we have only to decide whether the subject is included in the parties' duty to negotiate "grievance procedures."

"Grievance procedures" are described in § 20.18 as "procedures for the consideration of public employee grievances and disputes over the interpretation and application of agreements." The only provision of § 20.18 relating to costs refers to costs of arbitration, not the cost of investigating and processing grievances by grievance committee members.

Plainly, permitting committee members to investigate and process grievances dur-

ing working hours without loss of pay is nothing more nor less than one aspect of procedure for handling grievances.

This is manifest from § 20.18. It contains this provision: "Public employees of the state shall follow either the grievance procedures provided in a collective bargaining agreement, or in the event no such procedures are so provided, shall follow grievance procedures established pursuant to chapter 19A."

The grievance procedures under chapter 19A, governing merit employment, include this provision: "All grievances and complaints shall be discussed on state time, except no overtime or compensatory time shall be allowed if the proceedings extend beyond the employee's normal working hours." IAC § 570–15.2(3). Therefore, if the collective bargaining agreement does not establish grievance procedures, the statute requires the parties to use procedures promulgated under chapter 19A which include a provision for conducting proceedings on employer time without loss of pay. It should be apparent from this that the legislature views the subject of the present grievance proposal as part of grievance procedure.

Furthermore, I do not believe the employer's right to direct work under § 20.7 affects this issue. As acknowledged by the court, the provisions of § 20.9 are exceptions to employer rights under § 20.7. As exceptions, the provisions of § 20.9 are not in conflict with § 20.7 and are entitled to be given effect. Grievance procedures, hours, vacations, leaves of absence, transfer procedures, health and safety matters, in-service training, and perhaps other § 20.9 mandatory bargaining subjects, impinge upon the employer's prerogative under § 20.7 to direct the work of employees. However, that fact does not alter their nature as mandatory bargaining subjects. Therefore, once a proposal is identified as a grievance procedure, it is a mandatory bargaining subject notwithstanding § 20.7.

Therefore I would hold that the grievance proposal in this case is a mandatory bargaining subject.

UHLENHOPP and HARRIS, JJ., join in this dissent.