# IN THE SUPREME COURT OF IOWA

No. 16 / 05-1068

Filed October 19, 2007

**WATERLOO EDUCATION ASSOCIATION**,

   Appellant,

vs.

**IOWA PUBLIC EMPLOYMENT RELATIONS BOARD**,

   Appellee,

and

**WATERLOO COMMUNITY SCHOOL DISTRICT**,

   Intervenor-Appellee.

_____

Appeal from the Iowa District Court for Polk County, Douglas F. Staskal, Judge.

The association appeals the decision of the district court affirming an agency decision finding that their overload pay proposal was not a mandatory subject of collective bargaining. **REVERSED AND REMANDED.**

Gerald L. Hammond, Des Moines, for appellant.

Jan V. Berry, Des Moines, for appellee.

Brian L. Gruhn of Gruhn Law Firm, Cedar Rapids, for intervenor-appellee.

**APPEL, Justice.**

In this case, we must decide whether an overload pay proposal submitted by the Waterloo Education Association (Association) to the Waterloo Community School District (District) is a mandatory or permissive subject of collective bargaining under section 20.9 of the Iowa Public Employment Relations Act (PERA). The Public Employment Relations Board (PERB) ruled that the proposal was a permissive subject of bargaining. The district court affirmed. We find the specific proposal in this case to be a mandatory subject of collective bargaining. We therefore reverse the district court and remand the matter for further proceedings.

## I. Prior Proceedings.

The Association filed a petition with PERB seeking an expedited determination on whether the overload pay proposal it presented to the District was a mandatory subject of bargaining under section 20.9 of PERA. The overload pay proposal provided that elementary teachers who teach more than three hundred minutes per day as part of regular work assignments "shall receive additional compensation." "Secondary and middle school teachers who are assigned to teach six (6) classes per day" were also entitled to additional compensation. The overload pay proposal provided that additional teaching assignments would be compensated at "the employee's hourly proportionate per diem rate."

PERB issued a preliminary ruling finding that the proposal constituted a permissive subject of bargaining and followed the preliminary ruling with a lengthy final order containing the Board's reasoning. In its final order, PERB stated that it believed that the precedents of this court required the result. PERB, however, stated that

this court's precedents suffer from an error that PERB itself may have precipitated through its own poorly reasoned decisions. The Board stated that if it did not feel constrained by our precedents, it would hold that the proposal was a mandatory subject of collective bargaining.

The Association appealed the decision to district court, which affirmed the PERB decision. The Association then filed a timely notice of appeal with this court.

## II. Standard of Review.

As a threshold matter, we must determine whether the Board's interpretation of section 20.9 is entitled to deference. Under Iowa Code section 17A.19(10)(*c*), (*l*) (2005), deference is warranted where interpretation of the statute is "clearly . . . vested by a provision of law in the discretion of the agency." "If the interpretation is so vested, then the court may reverse only upon a finding the agency's interpretation was 'irrational, illogical, or wholly unjustifiable.' " *Birchansky Real Estate, L.C. v. Iowa Dep't of Pub. Health, State Health Facilities Council*, 737 N.W.2d 134, 138 (Iowa 2007) (quoting Iowa Code § 17A.19(10)(*c*), (*l*)). Alternatively, if interpretation has not been explicitly vested in the agency, our review is for errors at law. *Id.* Whether a proposal is a mandatory subject of collective bargaining, as defined by Iowa Code § 20.9, has not been explicitly vested in PERB's discretion. *See Insituform Technologies, Inc. v. Employment Appeal Bd.*, 728 N.W.2d 781, 800 (Iowa 2007) (holding that interpretation of "willful" was not vested within the agency's discretion). Therefore, our review is for correction of errors at law. Iowa Code § 17A.19(10)(*c*).

**III. Discussion.**

**A.    Introduction to Scope of Bargaining Issues.**    With the enactment at the height of the Great Depression of the National Labor Relations Act (NLRA), 29 U.S.C. sections 151–69 (2005), the prevailing view was that mandatory collective bargaining was an appropriate mechanism to adjust the conflicting relationship between economically powerful employers and comparatively weak employees.  While the power of employees would obviously be strengthened by collective bargaining, it was generally believed that market forces would prevent employees from gaining too much at the expense of an employer.  If wages became too high, the price of goods or services offered by the employer could become uncompetitive, thereby forcing moderation in employee demands.

In contrast, it was almost unanimously assumed that the collective bargaining model had no application to the public sector.  Even President Franklin D. Roosevelt advised public employee leaders that "the process of collective bargaining, as usually understood, cannot be translated into the public service" because the employer was "the whole people" speaking through their public representatives.  Letter from Franklin D. Roosevelt to Luther Steward (August 31, 1937), *as reprinted in* Christine G. Cooper & Sharon Bauer, *Federal Sector Labor Relations Reform*, 56 Chi.-Kent L. Rev. 509, 511–12 (1980).  In short, it was feared that collective bargaining would intrude too deeply upon public policy matters that should be decided by responsible public officials.

Over time, the presumption that the collective bargaining model had no application to the public sector came under challenge.  As noted by Professor Merton Bernstein, after the enactment of the NLRA and the growth in the number and power of private sector unions, a large

number of semiskilled and skilled workers entered the middle class, while public employees such as teachers did not experience similar gains. This apparent disparity increasingly caused government employees to demand reforms designed to improve their economic standing. Merton C. Bernstein, *Alternatives to the Strike in Public Labor Relations*, 85 Harv. L. Rev. 459, 460 (1971). Across the country, various commissions and studies were conducted to determine if and how collective bargaining concepts could be applied to the public sector.

Beginning with Wisconsin in 1959, state legislatures began to enact legislation authorizing collective bargaining in the public sector. Joan Weitzman, *The Scope of Bargaining in Public Employment* 40–41 (1975). By 1974, forty states had adopted some kind of collective bargaining for public employees, while twenty-eight states enacted comprehensive statutes of general applicability. *Id.*

Most of these state public collective bargaining statutes adopted language similar to the NLRA model, which expansively authorized mandatory collective bargaining over wages, hours, and "other terms and conditions of employment." Many state public collective bargaining statutes, however, also included management rights provisions designed to reserve certain managerial and policy decisions. The goal seems to have been to allow public employees to collectively bargain to improve their economic well-being without unduly sacrificing the ability of politically responsible officials to manage public bodies and establish the broad contours of public policy.

Iowa lagged behind in the enactment of public employment collective bargaining legislation. At first, public employees pursued collective bargaining through exclusive employee representatives without

express legislative authorization. In *State Board of Regents v. United Packing House & Allied Workers, Local No. 1258*, 175 N.W.2d 110 (Iowa 1970), this court held that public agencies did not have the power to agree to exclusive representation by an employee organization for collective bargaining without legislative authorization. 175 N.W.2d at 113–14. Four years later in 1974, the Iowa legislature enacted PERA. 1974 Iowa Acts ch. 1095, § 9.

In PERA, the legislature declined to adopt the NLRA model on the question of what subject matters are mandatory subjects of collective bargaining. Instead of incorporating the expansive NLRA language mandating collective bargaining over wages, hours and "other terms and conditions of employment," the Iowa legislature instead specifically enumerated seventeen topics subject to collective bargaining. Iowa Code § 20.9.

These seventeen topics are sometimes referred to as the "laundry list" of mandatory subjects of collective bargaining. Specifically, section 20.9 provides that the public employer and the employee organization "shall" negotiate in good faith with respect to "wages, hours, vacations, insurance, holidays, leaves of absence, shift differentials, overtime compensation, supplemental pay, seniority, transfer procedures, job classifications, health and safety matters, evaluation procedures, procedures for staff reduction, in-service training, and other matters mutually agreed upon." *Id.*

Like many other states, the Iowa legislature also included a management rights provision in the statute. Section 20.7 of PERA states that public employers shall have "the exclusive power, duty, and right to," among other things, "[d]irect the work of its public employees,"

"[m]aintain the efficiency of governmental operations," and "[d]etermine and implement methods, means, assignments and personnel by which the public employer's operations are to be conducted." *Id.* § 20.7. Thus, Iowa's PERA contains both a provision establishing mandatory collective bargaining on specified matters and a contrapuntal management rights clause preserving exclusive, public management powers in traditional areas.

This court has recognized that section 20.9 establishes two classes of collective bargaining proposals: mandatory and permissive. *City of Fort Dodge v. Iowa Pub. Employment Relations Bd.*, 275 N.W.2d 393, 395 (Iowa 1979). Mandatory subjects are those matters upon which the public employer is required to engage in bargaining. *Id.* Permissive subjects are those that the legislature did not specifically list in section 20.9, but are matters upon which both the public employer and the employee organization simply agree to bargain. *Id.*

Whether a proposal is a mandatory or permissive subject of bargaining under section 20.9 is a critical issue. If a subject is within the scope of mandatory bargaining, the parties are required to bargain over the issue, and if agreement is not reached, the statutory impasse procedures, which ultimately lead to binding arbitration, are available. *Decatur County v. Pub. Employment Relations Bd.*, 564 N.W.2d 394, 396 (Iowa 1997). If, on the other hand, the proposal is a permissive subject of bargaining under section 20.9, the public employer may reserve the right to decide the issue unilaterally by declining to participate in bargaining. When the employer declines to bargain over a permissive subject, the impasse procedures in PERA are not available and decisions

related to the subject remain within the exclusive power of the public employer.

The central issue presented in this case is whether the Association's overload wage proposal is a mandatory or permissive subject of collective bargaining.

### B. Methods of Resolving Scope of Bargaining Disputes.

1. *Scope of bargaining in the state and federal courts.* From the beginning of collective bargaining, the question of what subject matters are mandatory subjects of collective bargaining sparked considerable litigation as employers and employee organizations jockeyed for position. In general, the United States Supreme Court has construed the NLRA to provide a relatively broad scope of mandatory bargaining under the phrase "wages, hours, and other terms and conditions of employment."

The United States Supreme Court has, however, held that even the expansive NLRA scope-of-bargaining provision has limits. For example, in *Fibreboard Paper Products Corporation v. National Labor Relations Board*, 379 U.S. 203, 85 S. Ct. 398, 13 L. Ed. 2d 233 (1964), the high court observed that the phrase "other terms and conditions of employment" was a flexible term which would expand to conform with prevailing industry practices. *Id.* at 210, 85 S. Ct. at 402–03, 13 L. Ed. 2d at 238.

In an important concurring opinion in *Fibreboard*, Justice Potter Stewart advanced the concept that there were certain core entrepreneurial activities that were not subject to collective bargaining. *Id.* at 223, 85 S. Ct. at 409–10, 13 L. Ed. 2d at 245–46 (Stewart, J., concurring). This line drawing, however, between bargainable "terms and conditions" and core entrepreneurial activities was to be done on a

case-by-case basis. *Id.* Ultimately, the Supreme Court articulated a balancing test for scope-of-bargaining issues in which the benefits for labor-management relations must be greater than the burdens placed on an employer subject to bargaining. *First Nat'l Maintenance Corp. v. Nat'l Labor Relations Bd.*, 452 U.S. 666, 679, 101 S. Ct. 2573, 2581, 69 L. Ed. 2d 318, 331 (1981).

In the context of state public bargaining statutes that use the expansive NLRA phrase "other terms and conditions of employment" to describe mandatory bargaining subjects, the analysis becomes even more complicated with the inclusion of a management rights provision. Employment terms and conditions are often intertwined or entangled with public policy issues that have traditionally been within the purview of public employers. In order to accommodate the special needs of public employers, state courts with NLRA-type scope-of-bargaining provisions have developed a wide variety of "balancing tests" to be applied at the threshold stage of the scope-of-bargaining analysis. *See, e.g., Central City Educ. Ass'n, IEA/NEA v. Illinois Educ. Labor Relation Bd.*, 599 N.E.2d 892, 904–05 (Ill. 1992) (holding that test includes whether benefits of bargaining for employee outweighs burden on employer); *City of Biddeford by Board of Educ. v. Biddeford Teachers Ass'n*, 304 A.2d 387, 420 (Me. 1973) (Wernick, J., concurring in part, dissenting in part) (noting quantitative and qualitative importance of invasion of managerial functions may override prima facie eligibility for collective bargaining as working condition); *Local 195, IFPTE, AFL-CIO v. State*, 443 A.2d 187, 192–93 (N.J. 1982), *superseded by statute*, N.J. Stat. Ann. § 34.13A–23 (1990), *as recognized in Jackson Twp. Bd. of Educ. v. Jackson Educ. Ass'n ex rel. Scelba*, 757 A.2d 311, 314 (N.J. Sup. Ct. 2000) (stating proper

approach is to balance degree to which a proposal intimately and directly affects the work and welfare of employees against the degree to which the proposal significantly interferes with management prerogatives related to government policy); *Pennsylvania Labor Relations Bd. v. State College Area Sch. Dist.*, 337 A.2d 262, 268 (Pa. 1975) (discussing whether impact of issue on interest of employee in wages, hours, and other terms and conditions of employment outweighs its probable effect on basic policy of school system).

The rationale of state courts adopting the threshold balancing approach is that the "terms and conditions of employment" that constitute mandatory subjects of collective bargaining are also invariably connected with some functions arguably within the purview of management, either through a management rights provision or through traditional analysis. *City of Biddeford*, 354 A.2d at 419 (Wernick, J., concurring in part, dissenting in part) (noting as a practical matter, working conditions are invariably connected with some managerial function). Conversely, almost every management decision traditionally thought to be within the purview of a public employer has some impact on an employee's terms and conditions of employment. *Rapid City Educ. Ass'n v. Rapid City Area Sch. Dist. No. 51–4*, 376 N.W.2d 562, 566 (S.D. 1985) (Henderson, J., concurring) (stating that almost every decision of public employer affects "terms and conditions of employment"); *see also Los Angeles County Employees Ass'n, Local 660 v. County of Los Angeles*, 108 Cal. Rptr. 625, 628 (Cal. Ct. App. 1973) (same).

Thus, in cases involving statutes with expansive NLRA-type scope-of-bargaining provisions, there is a conflict between the expansive concepts of employee rights and traditional public employer prerogatives.

These are two highly territorial pikes at large in the legal pond of collective bargaining, each with the capacity of devouring the other. In order to avoid the predominance of either management or employee rights, state courts have concluded that they have no other choice but to engage in balancing of some kind. *Joint Bargaining Comm. of Pennsylvania Soc. Serv. Union v. Pennsylvania Labor Relations Bd.*, 469 A.2d 150, 153 (Pa. 1983) (noting "[w]ithout a proper balance the two sections [scope of bargaining including "terms and conditions" and management rights provision] might negate each other"); *Rapid City*, 376 N.W.2d at 566 (Henderson, J., concurring) (stating that the court is required to walk "legal tightwire" between employer and employee rights).

The judgment of these courts that they must somehow accommodate employee and management rights through a balancing process is certainly understandable. Without clear legislative standards as to the scope of bargaining, the courts in these states have been left to their own devices to fill in the statutory gap. *Kenai Peninsula Borough Sch. Dist. v. Kenai Peninsula Educ. Ass'n*, 572 P.2d 416, 423 (Alaska 1977) (stating that more specific guidance from legislature would be "helpful"); *Dunellen Bd. of Educ. v. Dunellen Educ. Ass'n*, 311 A.2d 737, 741 (N.J. 1973) (noting that legislative reference to "terms and conditions" of employment establishes shadowy line and hardly furnishes dispositive guidance).

While a judicially created balancing test has the potential of preserving the rough contours of the grand legislative compromise between management and employee rights over time, any balancing test is extraordinarily difficult to apply in individual cases. This difficulty is not surprising in light of the fact that it is impossible to objectively

measure or quantify the weight of employer and employee interests. Further, even if there was some kind of objective measurement of each interest, the balancing test requires courts to balance the apples of employee rights against the oranges of employer rights. No court has been able to successfully advance a convincing formula for determining how many employee rights apples it takes to equal an employer rights orange. Finally, the ill-defined nature of balancing tests in general gives rise to the possibility that invisible, unconscious, but perhaps inevitable judicial bias could creep into the decision-making process. *See Developments in the Law – Public Employment*, 87 Harv. L. Rev. 1676, 1689 (1984) (noting that with no clear standards in balancing tests, judges invariably fall back on their own political visions of the ideal power relationship between government and its employees). As noted by Harry H. Wellington and Ralph K. Winter in their classic essay, courts are badly suited to make judgments about which issues should be bargainable. Harry H. Wellington & Ralph K. Winter, *The Limits of Collective Bargaining*, 78 Yale L.J. 1107, 1126 (1968).

In light of these challenges, it is not surprising that the state court application of threshold balancing tests in the scope-of-bargaining context has yielded a riot of fact-specific results that defy orderly characterization. For instance, a lengthy annotation presents in excruciating detail the conflicting results on a myriad of issues. *See generally* James D. Lawlor, *Validity and Construction of Statutes or Ordinances Providing for Arbitration of Labor Disputes Involving Public Employees*, 68 A.L.R.3d 885 (2007), comparing, for example, *West Hartford Educ. Ass'n v. DeCourcy*, 295 A.2d 526 (Conn. 1972) (class size subject to mandatory bargaining), with *West Irondequoit Teachers Ass'n*

*v. Helsby*, 315 N.E.2d 775 (N.Y. 1974) (class size not bargainable), *Clark County Sch. Dist. v. Local Gov't Employee Management Relations Bd.*, 530 P.2d 114 (Nev. 1974) (school calendar issues negotiable), with *Burlington County College Faculty Ass'n v. Bd. of Trustees, Burlington County College*, 311 A.2d 733 (N.J. 1973) (college calendar not negotiable), and *Local 195*, 443 A.2d at 187 (subcontracting of work not subject to mandatory negotiation), with *Unified Sch. Dist. No. 1 of Racine County v. Wisconsin Employment Relations Comm'n*, 259 N.W.2d 724 (Wisc. 1977) (issue of subcontracting subject to mandatory bargaining).  While a balancing test for determining scope-of-bargaining issues may be necessary when legislatures have delegated open-ended authority to the courts, it is an imperfect approach for courts that favor principled decision-making over ill-defined discretionary exercises.  Balancing tests are a product of raw legal necessity, not judicial preference.

Where a legislature elects not to use the expansive NLRA phrase "other terms and conditions of employment" and chooses instead to list a finite number of enumerated topics, the case for a balancing test becomes even less compelling.  For example, in Kansas, the legislature originally adopted an NLRA-type mandatory bargaining provision in a statute regarding public teacher collective bargaining.  In response, the Kansas Supreme Court developed an impact test that involved balancing the impact of an issue on the well-being of the individual against the overall effect on the operation of the school system.  *Nat'l Educ. Ass'n of Shawnee Mission, Inc. v. Bd. of Educ. of Shawnee Mission Unified Sch. No. 512*, 512 P.2d 426, 435 (Kan. 1973), *superseded by statute*, Kan. Stat. Ann. § 75-4322(t) (1977), *as recognized in Kansas Bd. of Regents v.*

*Pittsburgh State Univ. Chapter of Kansas-Nat'l Educ. Ass'n*, 667 P.2d 306, 318 (Kan. 1983).

While the Kansas legislature at first embraced the approach of *Shawnee Mission*, it later amended its statute to delete the NLRA-type scope-of-bargaining language. *Unified Sch. Dist. No. 501 v. Sec'y of Kansas Dep't of Human Resources*, 685 P.2d 874, 876–77 (Kan. 1984). Instead the legislature provided a closed, finite list of topics that would be mandatory subjects of collective bargaining for teaching professionals. *Id.* In light of the legislative action, the Kansas Supreme Court, following the lead of the responsible administrative agency, sanctioned the adoption of a topics test to replace its prior impact balancing test to determine scope-of-bargaining issues. *Id.*

Under the topics test, the scope of bargaining is determined by whether the topic of a proposal is within the scope of one of the specifically enumerated subjects of collective bargaining. If a proposal was definitionally within the scope of one of the enumerated topics, it is a mandatory subject of collective bargaining. If it fell outside the definition of any mandatory topic, the proposal was not negotiable. *Id.* at 877. A threshold balancing determination is not required under the topic test because the legislature has already performed the balancing by including each specific topic as a subject of mandatory bargaining.

Thus, instead of dealing with two pikes in a pond, legislatures that have adopted a "laundry list" have gone to dry land and established a legal shooting range with a series of legislatively established targets of mandatory bargaining. Proponents of mandatory bargaining must hit one of the targets, or come close enough to one, in order to avoid characterization of the proposal as permissive. The role of the courts in

this setting is not to balance the pikes, but to judge the accuracy of the proponent's legal shot.

2. *Iowa approach to scope of bargaining issues.* In determining whether a proposal is within the scope of section 20.9, this court noted early on that the Iowa House of Representatives approved an amendment to the original bill deleting the expansive NLRA phrase "or other terms and conditions of employment" from the list of mandatory subjects. *Charles City Cmty. Sch. Dist. v. Pub. Employment Relations Bd.*, 275 N.W.2d 766, 771 (Iowa 1979) [hereinafter *Charles City I*]; *Fort Dodge,* 275 N.W.2d at 398. The final version of the bill did not contain the expansive NLRA language. Instead, the final version of the Iowa PERA contained a finite, or laundry list, of mandatory subjects of collective bargaining. 1974 Iowa Acts ch. 1095, § 9. Because the Iowa PERA does not include the phrase "other terms and conditions of employment," this court has held that if a proposal does not fall within one of the laundry list of terms contained in section 20.9, it is not a subject of mandatory bargaining. *Charles City I,* 275 N.W.2d at 771–73; *Fort Dodge,* 275 N.W.2d at 397–98. In other words, this court has held that the legislature's laundry list in section 20.9 is exclusive and not merely descriptive or suggestive. *See* Lawrence E. Pope, *Analysis of Iowa Public Employment Relations Act,* 24 Drake L. Rev. 1, 33–34 (1974).

In *Charles City I,* the court announced a two-pronged test to determine negotiability questions. *Charles City I,* 275 N.W.2d at 772–73. The first prong was a topics test—whether a particular proposal fell within the scope of any of the specifically delineated terms in section 20.9. *Id.* If a proposal was not within the scope of one of the specifically delineated terms, it was not subject to mandatory bargaining. *Id.* If,

however, the proposal was within the scope of one of the delineated terms, the court moved on to the second prong, specifically, whether collective bargaining over the proposal would be illegal. *Id.* If the proposal was not illegal then the proposal would be subject to collective bargaining. *Id.* This two-step approach was reiterated the following year in *Charles City Education Association v. Public Employment Relations Board*, 291 N.W.2d 663, 666 (Iowa 1980) [hereinafter *Charles City II*].

Even though the early PERA cases articulated this straightforward two-pronged scope-of-bargaining test, the court nonetheless struggled with the relationship between section 20.7, which contains the exclusive rights of management, and section 20.9, which contains the mandatory bargaining provisions. For example, in *Charles City I,* the court expressly noted the need to "harmonize" the sections. *Charles City I*, 275 N.W.2d at 775. Similarly, in *Charles City II*, the majority approved the harmonizing approach in *Charles City I*, noting the need to construe statutory provisions in the context of the entire enactment. *Charles City II*, 291 N.W.2d at 666. Although the majority in these cases did not expressly embrace a balancing test, the implication in *Charles City I* and *II* seems to have been that employee rights in section 20.9 had to be balanced or harmonized with management rights in section 20.7.

Early dissenting opinions rejected the harmonizing approach. According to the dissents, the list of topics in section 20.9 should be regarded as exceptions to or carve-outs of the management rights in section 20.7. As a result, the dissenters argued that there is no need to harmonize or balance the sections in determining whether a proposal is subject to mandatory bargaining. According to the dissenters, the only requirement is simply to properly define the scope of the terms in section

20.9. *See Charles City I*, 275 N.W.2d at 776 (McCormick, J., dissenting in part) (noting that employer's right to direct work under section 20.7 does not affect scope of bargaining under section 20.9); *Fort Dodge*, 275 N.W.2d at 399 (McCormick, J., dissenting) (rejecting "balancing" of employee bargaining rights against reserved employer prerogative).

In 1987, the court returned to better moorings in *Northeast Community School District v. Public Employment Relations Board*, 408 N.W.2d 46 (Iowa 1987) [hereinafter *Northeast*]. In this case, the court reiterated the two-pronged test of negotiability presented in *Charles City I and II. Id.* at 50. Unlike in *Charles City I* and *II*, however, the court further noted that if a proposal falls within an exception established by section 20.9, "then the proposal is subject to negotiation regardless of the broad grant of authority given to public employers under section 20.7." *Id.* This principle is the essence of a topics test, where the question of the scope of bargaining is primarily a definitional exercise and does not involve balancing of employee interests against management interests. In effect, the court in *Northeast* adopted the analytical approach of the dissenters in *Charles City I* and *Fort Dodge*.

The court returned to the issue of the relationship between sections 20.7 and 20.9 in *State v. Public Employment Relations Board*, 508 N.W.2d 668 (Iowa 1993) [hereinafter *State*]. In *State*, the court noted that "[v]irtually all of the mandatory subjects of collective bargaining impact in some way on the reserved rights of public employers." *State*, 508 N.W.2d at 675. Instead of engaging in a threshold balancing of employer and employee interests, however, the *State* court reemphasized the two-pronged approach adopted in the early Iowa PERA cases. According to *State,* the first prong inquiry is a topics test—whether the

proposal, on its face, logically falls within the definition of any term contained in section 20.9. *Id.* at 672. In determining whether a proposal fell within the definition of a section 20.9 term, the *State* court observed that consideration must be given to the predominant purpose of the proposal and to what the employer would be bound to do if the proposal was adopted. *Id.* at 673.

The *State* court, however, did recognize that in some cases, it may be necessary to conduct a balancing test to determine the predominant topic of ambiguous or hybrid proposals. *Id.* at 674. This "subordinate" balancing test, however, is distinguishable from threshold balancing tests employed by other states because it is not utilized in the ordinary case, but only in cases where the subject of a proposal "escapes easy definition." *Id.* In terms of methodology, the court in *State* adopted the topics approach of the dissents in early cases and of the court in *Northeast*, while leaving the door open for balancing in unusual cases where it was difficult to determine the predominant topic.

Most recently, this court has considered the scope-of-bargaining issue in two cases involving wages. In *Iowa City Association of Firefighters, IAFF Local 610 v. Iowa Public Employment Relations Board,* 554 N.W.2d 707 (Iowa 1996) and *Waterloo Community School District v. Public Employment Relations Board*, 650 N.W.2d 627 (Iowa 2002) [hereinafter *Waterloo I*], the court considered whether hours and wage proposals were within the scope of mandatory bargaining under section 20.9. In these cases, however, the court seemingly retreated from the teachings of *Northeast* and *State.*

In *Firefighters*, the hours proposal limited the time that firefighters could be required to assume "active duties" within any twenty-four-hour

shift of "regular" duty hours. *Firefighters*, 554 N.W.2d at 708. A second wage proposal was similar to the hours proposal, with the important distinction that it did not expressly limit the time and hours of "active duty," but provided that management pay a wage premium in the event it requested firefighters to perform "active duty" tasks during "regular duty" hours. *Id.* at 709.

The majority of this court in *Firefighters* held that both proposals were not subject to mandatory bargaining. With respect to the hours proposal, the court noted that the proposal "clearly impinged" upon management's authority by dictating when the specific duties of firefighters could be performed. *Id.* at 711. With little analysis, the court also rejected the wage proposal on the ground that it too impermissibly impinged upon management rights. *Id.* A dissenting opinion asserted that the proposals fell within the scope of the term "wages" under section 20.9 and that the topics test, as utilized in *Northeast* and *State*, should end the analysis. *Id.* at 712 (Carter, J., dissenting).

Although *State* was cited in the majority opinion, the *Firefighters* impingement rationale is inconsistent with *State's* observation that all subjects of mandatory bargaining impinge in some way on management rights. *State*, 508 N.W.2d at 675. The *Firefighters* impingement rationale is also inconsistent with *Northeast,* as that case held that once a proposal is found within the scope of a mandatory subject of collective bargaining under section 20.9, it did not matter whether a proposal "impinges" on management rights. *Northeast*, 408 N.W.2d at 50.

This court's most recent exploration of the distinction between permissive and mandatory subjects of bargaining under PERA was in *Waterloo I,* 650 N.W.2d at 627. In this case, the court considered a

number of proposals, including an overload wage proposal that was similar to the proposal involved in this case. As here, the overload wage proposal in *Waterloo I* stated that teachers who teach more than three hundred minutes per day, or intermediate and secondary teachers who teach more than five periods per day, would be entitled to overload pay. *Id.* at 634. Unlike the current proposal, however, the proposal in *Waterloo I* allowed teachers to refuse overload assignments. *Id.* In short, under the proposal in *Waterloo I*, a teacher would have been empowered to say "nice, but no thanks" to a request by school managers that a teacher accept an overload assignment.

In *Waterloo I* this court, citing *Firefighters*, held that an overload wage proposal with an employee veto provision would "adversely affect the employers' exclusive right to control work performed." *Id.* As in *Firefighters*, the court cited *State's* two-pronged test, including the topics test, but did not directly apply it. *Id.* at 630.

### C. Application of Scope-of-Bargaining Principles.

1. *Introduction.* In this case, the parties in *Waterloo I* are back before us. This time, however, the posture of the case is different in two respects. First, the proposal now advanced by the Association does not allow teachers to opt out of overload assignments. As a result, unlike in *Waterloo I*, management retains the unfettered right to assign overload work to any teacher of its choosing. In addition, PERB has taken the unusual posture of participating actively in this litigation. As noted previously, the Board's decision explicitly questioned both the wisdom and consistency of its and this court's prior mandatory bargaining opinions. In its brief filed in this case, PERB urged this court to clarify the confusion.

2.  *Proper test of negotiability.*  At the outset, we must determine the proper test for determining whether a proposal is subject to mandatory bargaining under section 20.9.  The determination of whether a proposal is a mandatory subject of collective bargaining is an issue of law based upon a facial review of the proposal.  Iowa Code § 17A.19(10)(*c*), (*l*);  *Saydel Educ. Ass'n v. Pub. Employment Relations Bd.*, 333 N.W.2d 486, 490 (Iowa 1983).

In resolving scope-of-bargaining issues, we reject the approach that any proposal which "infringes" upon management rights is not subject to mandatory bargaining.  As was stated in *State*, all mandatory subjects of bargaining infringe in some way on management rights.  If the test of negotiability were truly a simple infringement test, literally nothing would be subject to mandatory collective bargaining.  *State*, 508 N.W.2d at 675; *Charles City I*, 275 N.W.2d at 776 (McCormick, J., dissenting in part).  Certainly any wage proposal "infringes" on management rights by allocating resources that might be otherwise available for programming or other educational expenditures.  To the extent that language in *Waterloo I* and *Firefighters* is to the contrary, it is disapproved.

We also reject the notion that the issue of negotiability should ordinarily be resolved at the outset by balancing the employer's interest in management rights against the interest of employees in mandatory bargaining.  As noted above, while many states adopt such threshold balancing tests, the states which employ this method are generally operating under NLRA-type statutes which couple the expansive "other terms and conditions of employment" language with management rights provisions.  The balancing test is necessary, in these jurisdictions, to

prevent management rights from being totally eviscerated by unfettered collective bargaining.

Because Iowa's PERA does not contain this expansive language, the subjects of mandatory bargaining delineated in section 20.9 should be viewed as exceptions to management rights reserved in section 20.7. *Charles City I*, 275 N.W.2d at 772. By creating the section 20.9 laundry list of exceptions to management prerogatives, the legislature has already done the balancing. There is no occasion for this court to judicially rebalance what the legislature has already balanced.

As a result, we reject the "infringement" or threshold balancing test approach and instead reaffirm the two-pronged approach to negotiability described in *State* and *Northeast.* The first prong for determining whether a proposal is subject to collective bargaining, the threshold topics test, is ordinarily a definitional exercise, namely, a determination of whether a proposal fits within the scope of a specific term or terms listed by the legislature in section 20.9. Once that threshold test has been met, the next inquiry is whether the proposal is preempted or inconsistent with any provision of law. Ordinarily, this two-step process is the end of the matter. Only in unusual cases where the predominant topic of a proposal cannot be determined should a balancing-type analysis be employed to resolve the negotiability issue. *See Clinton Police Dep't Bargaining Unit v. Iowa Pub. Employment Relations Bd.*, 397 N.W.2d 764 (Iowa 1986) (hybrid proposal involving both safety and staffing subjects held to primarily relate to staffing and thus not subject to mandatory collective bargaining).

3. *Application of topics test to overload pay proposal.* Having determined that the two-pronged approach of *State* and *Northeast* is the

proper test of negotiability, we now must apply the test to the overload pay proposal presented here. In order to apply the threshold topics test, however, we must first determine the meaning of the term "wages" in section 20.9. Then, we must determine if the proposal falls within the scope of that definition.

In determining the meaning of the term "wages," our prior cases embrace several guides to interpretation. These cases hold that because the legislature has listed the term "wages" in section 20.9 as a topic separate and apart from other tangible employee benefits, such as vacation and insurance, the term "wages" is subject to a relatively narrow construction in order to avoid an interpretation that renders subsequent items in the laundry list redundant and meaningless. Under these cases, the term "wages" cannot be interpreted to include a broad package of fringe benefits because the legislature has specifically included some fringe benefits in this section's laundry list. *Fort Dodge*, 275 N.W.2d at 397. We see no reason to depart from the approach of these prior cases.

On the other hand, the legislature's use of a laundry list of negotiable subjects does not mean that the listed terms are subject to the narrowest possible interpretation, but only that the listed terms cannot be interpreted in a fashion so expansive that the other specifically identified subjects of mandatory bargaining become redundant. The approach most consistent with legislative intent thus is to give the term "wages" its common and ordinary meaning within the structural parameters imposed by section 20.9. *Charles City II*, 291 N.W.2d at 668; *Fort Dodge*, 275 N.W.2d at 397.

In order to determine the common or ordinary meaning of words, we have often consulted widely used dictionaries. *Black's Law Dictionary*

defines "wages" as "[p]ayment for labor or services, usually based on time worked or quantity produced." *Black's Law Dictionary* 1573 (7th ed. 1999). *Merriam-Webster's Collegiate Dictionary* defines wages as payment for labor or services on an "hourly, daily, piecework basis." *Merriam-Webster's Collegiate Dictionary* 1322 (10th ed. 2002).

Applying the threshold topics test in *State*, we conclude that the proposal falls within the definition of the term "wages." At its core, the proposal simply seeks to introduce an element of piecework pay into the school district's wage structure. The proposal, moreover, calls for the payment of money and not some other kind of fringe benefit. The proposal if implemented would provide an economic reward based upon services rendered. As noted by one state public employee relations board when considering the bargainability of an overload pay proposal, "It is only possible to rationally bargain for 'an honest day's pay' if one can also negotiate the boundaries and the contents of 'an honest day's work.'" *Oregon Pub. Employees Union, Local 503 v. State of Oregon*, 10 PECBR 51 (July 1987); *see also Rapid City*, 376 N.W.2d at 565 (proposal for twenty percent increase in annual compensation for each fifty-five-minute period in excess of five at junior or senior high level subject to mandatory collective bargaining).

The employee's economic interest in more pay for more work is precisely the kind of employee interest that leading commentators for decades have suggested should be subject to collective bargaining. Clyde Summers, *Bargaining in the Government's Business: Principles and Politics*, 18 U. Tol. L. Rev. 265, 271 (1987); Clyde W. Summers, *Public Employee Bargaining: A Political Perspective*, 83 Yale L.J. 1156, 1192–95 (1974). The interest of the employees in more pay for less work is

generally opposed by the majority of voters and taxpayers who are interested in obtaining more services at less cost. Summers, 18 U. Tol. L. Rev. at 271. The inclusion of the term "wages" in the laundry list is designed to provide employees with a degree of protection on economic issues from potentially powerful low-wage political influences.

The overload pay proposal in this case is distinct from the proposal involved in *Waterloo I*. In *Waterloo I*, the proposal sought to prohibit management from assigning overload work to an employee who did not wish to undertake it. As a result, in *Waterloo I* the proposal involved a hybrid of "wages" and "management rights." *Waterloo I*, 650 N.W.2d at 634. Although not articulated in this fashion, there was at least an issue as to which topic dominated the proposal. In contrast, the proposal here does not seek to limit management's discretion to assign work, but relates solely to payment for an amount of services rendered by an individual teacher. The proposal does not handcuff management prerogatives in any way other than to require increased payment for certain services.

Of course, whenever management is required to pay more for teacher services, the resultant increase in costs impinges on other management choices by diverting available resources from other potential uses. This impingement happens, in all cases involving wages and simply cannot be the basis for excluding a proposal from mandatory collective bargaining. Otherwise, the term "wages" would be entirely written out of the statute.

We recognize the possibility that artful negotiators may attempt to craft proposals that incidentally involve payment of increased wages to teachers, but which are really designed to influence educational policy or

limit management discretion. The *State* test, however, requires that a proposal relate predominantly to a bargainable issue. It further allows a balancing of interests in those unusual hybrid cases where mandatory and permissive elements are inextricably intertwined in a proposal.

Having concluded that the Association's overload pay proposal meets *State's* threshold topics test, we now turn to the second prong of the *State* test—whether collective bargaining over the proposal would be illegal. Neither the District nor PERB has suggested that the overload pay proposal violates or is preempted by Iowa law. As a result, we find that the overload pay proposal presented here is a mandatory subject of collective bargaining.

In closing, we note that, as was consistently emphasized in our prior cases, we do not pass in any way on the merits of the overload pay proposal. *Charles City I*, 275 N.W.2d at 769. We hold only that the question of whether the overload pay proposal made in this case should be adopted in whole or in part by the district must be determined, if possible, by the parties themselves through good faith negotiations and in the event of impasse, through binding arbitration as provided in PERA. The finding of this court that the overload pay proposal is subject to mandatory bargaining is an endorsement only of the legislature's chosen process of resolving employer-employee disputes involving "wages," not the merits of the proposal.

## IV.  CONCLUSION.

We hold that the overload wage proposal in this case presents a mandatory subject of collective bargaining under section 20.9 of PERA. As a result, the decision of the district court is reversed and the case remanded for further proceedings.

**REVERSED AND REMANDED.**